# Ross's Appeal.

*Wills—Issue devisavit vel non—Insane delusions—Testamentary capacity.*

1. A will cannot be set aside by reason of insane delusions (general insanity not being shown), where it does not appear that the will was a direct offspring of such delusions, or that they controlled the mind of the testator in the making thereof, and caused the will to be different from what it would have been but for such delusions.

2. Where the general capacity of a testator is not impeached, and the will shows on its face that any insane delusions of which he may have been possessed did not control the will, and were not the moving cause of the disposition of his estate which he made, the fact of the delusions has no weight in determining the question of the validity of the will.

3. Testator, who suffered from delusions to the effect that he was afflicted with a serious disease, that he was insolvent, and that he was guilty of embezzling trust funds, but who was able to manage his financial affairs and understood the amount and character of his estate, left a paper written in his own hand, entitled "My last Will," by which he divided his estate into four parts, giving one-fourth each to a half brother and a half sister, one-fourth to

the children of a deceased half brother and one-fourth to a full sister, they being his nearest of kin. The lower court refused to award an issue devisavit vel non. *Held*, no error.

Argued Oct. 16, 1913. Appeal, No. 212, Oct. T., 1913, of Annie E. Ross, from decree of O. C. Washington Co., Nov. T., 1911, No. 48, dismissing appeal from decision of Register of Wills in Estate of Brit Hart, deceased. Before FELL, C. J., BROWN, MESTREZAT, ELKIN and MOSCHZISKER, JJ. Affirmed.

Appeal from order of the register of wills refusing an issue devisavit vel non. MCILVAINE, P. J., filed the following opinion:

The averment in the appellant's petition upon which she bases her claim for relief is as follows: "That at the time of the execution of the said paper, to-wit, May 24, 1911, the said Brit Hart did not have and possess a sound disposing mind, memory and understanding, and by reason of hallucinations, under which he was constantly laboring and by reason of which he believed that he had lost all his estate and that he was a pauper, he was incapable of understanding the extent and amount of his estate and the disposition made thereof in the said paper purporting to be his last will and testament."

From the testimony filed, it appears that Brit Hart died by his own hand from his jumping into a tank of water at the electric light plant in Washington, Pa., between Prospect avenue and Maiden street, on the 12th day of July, 1911. That for more than a year he had suffered with melancholia and harbored some insane delusions; that his melancholia was the result of the loss that he had sustained of his wife and four children within the few years before the time of his death. Mr. Hart was a man of intelligence and had a business of considerable extent which he successfully managed; but after the death of his wife, which left him all alone, he became discouraged and his health somewhat failed, and

he suffered from the loss of one of his fingers. This caused him to sell out his business, which was that of running an elevator and feed and supply store. This sale was made in April, 1910. This left him without anything apparently to occupy his mind, and in December of 1910, he gave a power of attorney to John A. Howden and Alyan Donnan to look after his property, to the end that he might be sent away some place for the purpose of improving his health and mental condition. First he planned to go to Florida; that was abandoned. Then he planned to go to Altoona, and that was abandoned; and finally on December 3, 1910, he was sent to the St. Francis Hospital, Pittsburgh, where he remained until the 23d of December. He was then brought back to Washington and remained for a while at the Siegel Hotel; then was taken to the Washington Hospital in Washington, and about February, 1911, he was taken to his old residence which was then occupied by David Hart and his wife, his nephew and niece, who succeeded him in his business and who occupied his old mansion house, and with them he lived until he died. After he came back home his health had somewhat improved, and he appeared to be not so mentally depressed. On May 24, 1911, he wrote his will and placed it in his safe in the library of his home where he then was residing and where it was found after his death. He left to survive him a full sister, Annie E. Ross, a half brother D. M. Hart, a half sister Elizabeth Dever, and the children of a half brother, James P. Hart, who comprised all his heirs at law. His estate, which was turned over to John A. Howden and Alvan Donnan under the power of attorney, consisted of about $25,000 in personal property, mostly judgments and securities, and a number of pieces of real estate the value of which was estimated at $25,000; and this property remained in their hands up to the time of his death and comprised his estate. During his lifetime he had been appointed guardian for three sets of children, and the personal estate which

came into his hands from these three estates amounted
to about $16,000 and was part of the securities turned
over to the attorneys-in-fact and which have been esti-
mated as worth $25,000.

After the will of the said Brit Hart was probated, his
full sister, Annie E. Ross, presented her petition in this
court which contained the allegation which we have
already quoted, and praying for an issue to determine
the validity of the will which had been probated.

The testimony of Dr. Walker, the attending physician
at St. Francis Hospital during the twenty days he was
there, as well as of his nurse at that place, shows that
Brit Hart was deeply depressed, suffering from melan-
cholia, and that he had certain delusions. One of these
was that his physical and mental suffering came from
syphilis; and it appeared from an examination of his
blood that he never had been afflicted with that disease.
It appeared also that in investing the money of his
wards he had invested it in his own name and that he,
in thinking the matter over, had come to the conclusion
that by having done so he was guilty of embezzlement
and that he was going to get into trouble by reason
thereof. He also appeared to have allowed the fact that
he had turned his property over to his attorneys-in-fact
and had gone out of business, to worry him, and at times
had the belief that he was likely to land in the poor
house, and that he had not, or would not have, the way
things were going, any property left. These thoughts
grew on him until he became possessed with the insane
delusion that he was a pauper, and would speak of life
as not being worth much to him any more, that his
friends were gone, and that his expenses were going on
and that he was not making anything and that he did
not have any property, and that the trust funds that he
had would be lost and that he would suffer for it. When
he was reasoned with and his property and liabilities
would be enumerated, he could fully understand and
comprehend the property that he possessed and the lia-

bilities that were upon him and that he was not insolvent; but it would not be long afterwards until he again would revert to or have the delusion. Neither the physicians nor those who frequently met with him thought him generally insane, but only that he was subject at times to these insane delusions. Dr. Scott was asked this question: "Doctor, on the matter of his financial affairs, I ask you to state whether or not at the time you treated him he was sane or insane?" A. "Well, he was sane; he would be insane on those conditions, you know, now for instance the matter of the syphilis and the matter of coming to want, those were insane conditions." Q. "Did he at times manifest a knowledge of his estate?" A. "Yes, he would go over that; he could tell you every item; he would name out each one of his liabilities and what his assets were, and seemed to have them the same always, always remembered them correctly; I presume they were correct; he would always give them about the same, and you would foot them up for him and show him that he had more assets than liabilities, and yet he couldn't shake that idea off; it would be all right for the time being, you know, when you would show him that, and then he would get out of that by saying that his expenses would be—" Q. "Now, Doctor, from your knowledge of the disease, is it natural to find patients suffering with melancholia and harboring insane delusions of that kind and yet in other ways have business judgment and business ability?" A. "Yes, many times they do." Q. "It is common with them?" A. "Yes." Q. "That is, they have insane delusions along certain lines, while in other respects their mind apparently is sane?" A. "Yes." A number of witnesses who came in contact with Mr. Hart were examined, but their testimony was substantially such as we have indicated that Dr. Scott's and Dr. Walker's was.

Upon this testimony, the question arises, whether or not an issue should be granted to determine whether or not these delusions affected the ability of Brit Hart to

write the will which it is admitted he did write.  In this connection the will itself becomes in our opinion the most important evidence in this case.  It is admitted that the whole of the will is written by Brit Hart on paper which he himself selected, being a bill head which he used in his business before he sold out.  The will is in these words:

"Washington, Pa., May 24th, 1911.

"My last Will.

"I give to D. M. Hart one fourth of my estate.  I give to the children of J. P. Hart, dec., the one fourth of my estate.  I give to Mrs. E. J. Dever the one fourth of my estate.  I give to Annie E. Ross the remaining one fourth of my estate.

"I appoint Alvan Donnon, John A. Howden and Dunning Hart my executors.

"BRIT HART."

The question for our consideration is, did the delusions which the testimony shows Brit Hart at times had, in any way affect his mind in the writing of that will.  If they did not, then no issue should be granted.

A study of this will shows that he knew the kind of instrument he was engaged in writing, for he heads it "My last Will."  It also shows that he knew that he had two half brothers, David M. Hart and J. P. Hart, and he evidently knew that J. P. Hart was dead and left children.  He knew that he had one half sister, Mrs. E. J. Dever, and he knew that he had a full sister, Mrs. Annie E. Ross.  He also knew how much he wanted to give each one of these persons to whom he was related; and he first gives one-fourth to D. M. Hart; then when he comes to his brother, James P. Hart, who is dead, he gives to the children of James P. Hart one-fourth of his estate; then when he comes to his half sister, Mrs. E. J. Dever, he gives her the one-fourth, and when he comes to the last devise he gives to Annie E. Ross the remaining one-fourth of his estate, showing his power of calculating and that he had already given away three-fourths of

his estate; and then he appoints the two persons who had been his attorneys-in-fact, together with his uncle Dunning Hart, his executors.

There is, in studying this will in connection with the fact that D. M. Hart and J. P. Hart were half brothers and Mrs. Dever a half sister, while Mrs. Ross was a full sister, and with the further fact that part of his estate was realty and part personalty, an evident purpose to make them share his estate in equal proportions, which they would not have done had he died intestate. To our mind, the intelligence and the apparent purpose of his making this will and the disposition he made of his estate and the manner in which he expressed himself in making that disposition, conclusively show that these delusions of which the witnesses testified were not operating on his mind, but that the will was made in one of those moments in which he had in his mind a clear and distinct purpose that embraced not only a knowledge of the persons to whom he wished his estate to go but the proportion that each should receive of that estate, be it large or small.

"A man may be of sound mind in regard to his dealings in general, but may be under an insane delusion, and whenever it appears that the will was the direct offspring of the partial insanity or monomania under which the testator was laboring at the very time the will was made, that it was the moving cause of the disposition, and that if it had not existed the will would have been different, it ought to be considered as no will, although the general capacity of the testator may be unimpeached."

And the opposite of this is also true. That is, if the general capacity of the testator is not impeached and the will shows on its face that any insane delusions of which he may have been possessed did not control the will and were not the moving cause of the disposition of his estate that he made, then the fact of the delusions has

no weight in determining the question of the validity of the will.

It is uniformly held that the question whether the existence of delusions or partial insanity will justify the setting aside of a will depends upon whether such delusions or partial insanity did or did not control the testator's mind when making the will: Taylor v. Trich, 165 Pa. 586; Thomas v. Carter, 170 Pa. 272; McGovran's Est., 185 Pa. 203; Hemingway's Est., 195 Pa. 291; Englert v. Englert, 198 Pa. 326; Buchanan v. Pierie, 205 Pa. 123.

In the last cited case, Justice POTTER said: "In order to justify the setting aside of the will, upon the grounds submitted, there must be evidence, not merely that the testator was the victim of a delusion, but that he was controlled by the delusion in the making of the will, and was led by it to improperly disregard his daughter and her sons. Does the record show that there was any such evidence in this case?"

A number of lower court decisions may also be cited to the same effect: Jacob's Est., 17 Pa. D. R. 369; Helferty's Est., 18 Pa. D. R. 324; Waller's Est., 20 Pa. D. R. 181; Philadelphia Trust Co. v. Drinkhouse, 17 Philadelphia 23; Brannon's Est., 18 Pa. D. R. 338.

These cases all hold that a will cannot be set aside by reason of insane delusions, (general insanity not being shown) when it does not appear that the will was the direct offspring of such delusions—that they controlled the mind of the testator in the making thereof, and caused it to be different from what it would have been but for the delusions.

In the first place, the delusion that Brit Hart had that his physical and mental condition was the result of his once having had syphilis, certainly was not a delusion that in any way controlled the making of his will. But granting that he had the other delusion that he was a pauper, is there anything to show that that delusion in any way affected the form and provisions of his will?

A glance at the scheme of the will furnishes at once a reply to that question. That scheme is an equal distribution among his brothers and sisters and their issue, of his whole estate whatever it may turn out to be, whether large or small. In fact the only departure that the will makes from what would be the distinct distributive scheme of the intestate law, is that he gives half brothers, including the children of one who was deceased, and his half sister a share of the real estate as well as the personalty, and to let them share in the real estate was the only occasion and purpose, as we have already said, of making the will at all, his design being that his estate, whatever it might amount to, after the payment of his debts, should be equally divided among his kindred. It is manifest that even if it were conceded that he was mistaken as to how much of an estate he had, such a delusion would have, and, if it existed, did have no effect whatever upon the form of the will.

The court refused to award the issue and dismissed the appeal.

*Error assigned* was the decree of the court.

*R. W. Irwin,* with him *A. T. Morgan* and *Jas. A. Wiley,* for appellant.—One of the essential elements of testamentary capacity is that the testator at the time of the execution of the will must have had a full and intelligent knowledge of the property he possesses: Reichenbach v. Ruddach, 127 Pa. 564; Mulholland's Est., 217 Pa. 65; Brinton's Est., 13 Philadelphia 234; Jacob's Est., 17 Pa. D. R. 369; Benoist v. Murrin, 58 Mo. 307; Boyd v. Eby, 8 Watts 66; Harden v. Hays, 9 Pa. 151; Hoopes' Est., 174 Pa. 373.

*James I. Brownson,* of *Donnans, Brownson & Miller,* for appellees.—The delusion on the ground of which this will is contested is immaterial, because it is not shown to have controlled or influenced the provisions of the

will: Tawney v. Long, 76 Pa. 106; Taylor v. Trich, 165 Pa. 586; Thomas v. Carter, 170 Pa. 272; Shreiner v. Shreiner, 178 Pa. 57; McGovran's Est., 185 Pa. 203; Englert v. Englert, 198 Pa. 326; Safe Dep. & Trust Co. v. Lange, 207 Pa. 527; Masseth's Est., 213 Pa. 136; Hemingway's Est., 195 Pa. 291; Buchanan v. Pierie, 205 Pa. 123; Guarantee Trust & Safe Dep. Co. v. Waller, 240 Pa. 575; Patterson v. Patterson, 6 S. & R. 55.

PER CURIAM, January 5, 1914:

The order of the court refusing an issue devisavit vel non is affirmed on the opinion of Judge MCILVAINE.