## Duross Will.

Argued January 12, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and MCBRIDE, JJ.

*Ralph W. D. Levan,* with him *Edward H. Younger-man,* for appellant.

*H. Ober Hess,* with him *Bruce L. Castor, Paul H. Edelman,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellee.

OPINION BY MR. JUSTICE BELL, April 20, 1959:

There are three questions of importance involved in this appeal: (1) Was Margaret Duross suffering from an insane delusion which directly controlled her will and caused it to be different than if the delusion had not existed? (2) What is the rule which governs a hearing Judge* in disposing of a motion for judgment non obstante veredicto, in a will contest? and (3) What is the test to be applied by an appellate Court in reviewing the entry by a hearing Judge of a judgment or decree non obstante veredicto?

Margaret A. Duross died by suicide on September 29, 1955, at the age of 45. She left a will dated *August 23, 1954,* which was duly proved and probated. Her signature was witnessed by a friend, Betty J. Keppley. Decedent was survived by two sisters, Mrs. M. Elizabeth Duross Hendricks and Mrs. Jane L.

---

* Usually called the Chancellor. In almost every case tried before a jury the hearing or trial Judge was referred to as a Chancellor. For the technical (but pertinently unimportant) difference between a Chancellor and a hearing Judge see *Williams v. McCarroll,* 374 Pa. 281, 297, 97 A. 2d 14.

Duross Fitzpatrick, and by two brothers, George H. Duross and John A. Duross.

Decedent left her residuary estate, consisting of $15,142 to her closest friend, Rose-Beth Woolley. She appointed her brother, John A. Duross, Executor. Miss Woolley was also the named beneficiary in a $5,000 life insurance policy dated September 12, 1949. Decedent gave her Pennsylvania Retirement Fund amounting to $3543 to her sister, Mrs. Hendricks, and a life insurance policy in the amount of $10,000 to her 11 nephews and nieces, four of whom were children of Mrs. Fitzpatrick.

Mrs. Fitzpatrick filed a petition for citation,* alleging (a) that testatrix was not of sound mind; (b) that the will was procured by undue influence; and (c) that the will was executed under the influence of an insane delusion which had no reasonable basis.

An issue was granted and the jury found: (1) that the decedent was not of sound and disposing mind, memory and understanding at the execution of her will; and (2) that the decedent was under an insane belief or delusion at the execution of her will, and that her will was a direct offspring of such insane delusion [that everybody hated her]. No evidence of any kind or description was introduced to prove undue influence; and no one testified that testatrix was not of sound mind. On the contrary, proponents affirmatively proved by a number of lay witnesses and by two doctors—and the hearing Judge found, based upon the uncontradicted and unassailable evidence, that testatrix was of sound and disposing mind at the time of execution of her will.

The hearing Judge ordered and decreed "that the verdict of the jury shall be set aside; the will of testa-

---

* This was a citation to show cause why the probate of the will should not be set aside and an issue granted.

trix of August 23, 1954 is hereby declared valid non obstante veredicto." From this Decree Mrs. Fitzpatrick took this appeal.

Appellant approaches this case under the mistaken belief, which is shared by many laymen and by some members of the medical profession, that disinheriting a child or relative invalidates a will and discloses a lack of testamentary capacity, or undue influence, or insanity or an insane delusion. Of course that is not the law.

Testamentary capacity is presumed and the burden of proving lack of testamentary capacity or an insane delusion is upon those who assert it: *Lauer Will*, 351 Pa. 438, 41 A. 2d 552; *Sturgeon Will*, 357 Pa. 75, 53 A. 2d 139; *O'Malley Will*, 370 Pa. 281, 88 A. 2d 69; *Kerr v. O'Donovan*, 389 Pa. 614, 134 A. 2d 213; *Williams v. McCarroll*, 374 Pa. 281, 97 A. 2d 14.

In *Johnson Will*, 370 Pa. 125, 87 A. 2d 188, Johnson, an illiterate colored man 84 years of age, the father of ten children, left by will two houses and their furniture to an acquaintance who was a white woman. Johnson was suffering from senile dementia, from occasional loss of memory, and from a mental disturbance pertaining to sex. This Court sustained the refusal of an issue devisavit vel non and said (pages 127-128, 129) : ". . . it is and always has been the law of Pennsylvania that every individual may leave his property by will to any person, or to any charity, or for any lawful purpose he desires, unless he lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion. While it is difficult for many people to understand how or why a man is permitted to make a strange or unusual or an eccentric bequest, especially if he has children or close relatives living, we must remember that under the law of Penn-

sylvania ' "a man's prejudices are a part of his liberty. He has a right to the control of his property while living and may bestow it as he sees fit" at his death: McCown v. Fraser, 327 Pa. 561, 192 A. 674; Cauffman v. Long, 82 Pa. 72.' . . .". See to the same effect: *Borsch Estate*, 362 Pa. 581, 67 A. 2d 119; *Guarantee Trust & Safe Deposit Co. v. Heidenreich*, 290 Pa. 249, 257, 138 A. 764; *Higbee Will*, 365 Pa. 381, 384, 75 A. 2d 599.

What is testamentary capacity was once again pointed out in *Williams v. McCarroll*, supra. In that case the jury found in the trial of an issue devisavit vel non, that the decedent did not have testamentary capacity to make a valid will on the day on which his last will was made, and that the will was obtained by undue influence practiced upon him by the residuary legatee. The Chancellor who saw and heard the witnesses entered judgment non obstante veredicto, and this judgment was affirmed by this Court. The Court in its opinion said (page 292): " ' . . . a decedent possesses testamentary capacity ". . . if he has an intelligent knowledge regarding those who are the natural objects of his bounty, of what his estate consists, and of what he desires done with it, even though his memory has been impaired by age or disease" ': Franz Will, 368 Pa. 618, 622, 84 A. 2d 292; also Sturgeon Will, 357 Pa. 75, 53 A. 2d 139; Ash Will, 351 Pa. 317, 41 A. 2d 620; Olshefski's Estate, 337 Pa. 420, 11 A. 2d 487." Moreover, "Less capacity is needed to make a valid will than is sufficient in most cases to transact ordinary business: Higbee Will, 365 Pa. 381, 382, 75 A. 2d 599; Sturgeon Will, 357 Pa. 75, 81, 53 A. 2d 139, and cases cited therein; Conway Will, 366 Pa. 641, 79 A. 2d 208": *Thompson Will*, 387 Pa. 82, 104, 126 A. 2d 740.

498

That brings us to the next question: What is an insane delusion and when is it sufficient to invalidate a particular will?

The law is well settled that a person may be of sound mind in regard to her general affairs and have testamentary capacity, yet at the same time may be under an insane delusion. It is difficult to formulate a definition of an insane delusion which will cover every possible case, but the general rule is clear that it must be, as its name implies, an insane delusion, and that it must have caused decedent to make his will in a manner *entirely different* from what he would have if the insane delusion did not exist.

In *Johnson Will*, 370 Pa., supra, the Court, quoting from *Leedom Estate*, 347 Pa. 180, 32 A. 2d 3, said (page 129): " 'It is well settled that "A delusion which will render invalid a will executed as the direct result of it is an insane belief or a mere figment of the imagination—a belief in the existence of something which does not exist and which no rational person, in the absence of evidence, would believe to exist:" Alexander's Estate, 246 Pa. 58, 62. See also McGovran's Estate, 185 Pa. 203 [and] . . . Thomas v. Carter, 170 Pa. 272, 282 [where the Court said]: "A man may be of sound mind in regard to his dealings in general, but he may be under an insane delusion, and whenever it appears that the will was the *direct offspring* of the partial insanity or monomania under which the testator was laboring at the very time the will was made, that it was *the moving cause of the disposition*,* and if it had not existed the will would have been different, it ought to be considered no will, although the general capacity of the testator may be unimpeached." ' "

Margaret Duross was in charge of the occupational therapy department at the Wernersville State Hospital

* Italics throughout, ours.

in 1954 and had been for many years. Her job was the supervision of a number of workers—usually 12 to 18 in number—and the planning of the activities of 800-900 patients in such things as arts and crafts, the utilization of weaving machines, the making of small projects of various sorts. Margaret's duties also included the purchase of supplies for the department; arranging for the sale and distribution of things made by the patients; she was recreational director, and planned and supervised dances, games and some athletic activities. Margaret was also in charge of the accounts of the department and she personally attended to these accurately and competently, including the month of August of 1954.

Miss Duross's work was to be greatly enlarged under a new State policy and she did not know whether the expanded work might be too big for her. Dr. Lutz suggested that Margaret consult an independent psychiatrist, not as a patient, but because the new head of the Department in Harrisburg had issued a directive that (high ranking) State employees should ascertain their own feelings and motivations in order to better ascertain and cope with the feelings and motivations of the patients at State Hospitals.

Mrs. Fitzpatrick, the contestant, produced only four witnesses. We shall summarize their testimony.

Dr. Pokrass, an eminently qualified psychiatrist, saw Margaret Duross on June 4, 1954, and on an average of nearly once a week thereafter until September 23,* 1954. He testified that Miss Duross told him that her friends on a social and professional level felt she was inadequate and incompetent, and that everybody,

---

* "After September 23, 1954, she had another appointment but she failed to show up. . . . She apparently felt that she didn't want help or didn't need help or something of that sort."

including her family and Dr. Pokrass, looked down on her because she was so stupid, and *they all hated her and she hated everybody.* "She couldn't talk very well, *she couldn't carry on a conversation* and she was very frightened of being invited to attend groups because she didn't know what to say or how to talk to people. She felt people really hated her although they pretended to like her. *Her clothes were poorly fitting, her hair was quite disheveled and disarrayed.* . . . She would seem to weigh her words very carefully, sometimes *for five or six minutes,* before replying to simple questions. Her thought processes were considerably slowed down; she was rather disheveled and ungainly. Obviously she was a manic depressive psychotic* in the acutely depressed phase. She had feelings of loathing and hatred for everyone and everybody could tell that by the way she acted."

Dr. Pokrass, who testified nearly four years after Margaret's will had been drawn, and then solely from his recollection—he kept no notes or records except a card showing the dates of her visits and the payments of his bills—had in August 1954 a caseload of 21 or 22 patients. It is evident from the testimony of *all* the other witnesses who knew Margaret Duross that he must have confused Margaret or some of her symptoms and traits with those of one or more of his other patients.

The contestant, Mrs. Fitzpatrick, and her brother George H. Duross, testified that Margaret loved her and her sister and brothers, and nephews and nieces; that she visited them frequently (Mrs. Fitzpatrick and their other sister, Mrs. Hendricks, lived in Georgia, and their two brothers, George and John, lived in or

---

* Manic depressive psychosis is a descriptive term given to a particular type of insanity.

near Philadelphia). George Duross testified that Margaret visited him and his family for years—including the years 1954 and 1955—usually on a Saturday afternoon or for Sunday dinner. She would just knock on the door and walk in. When Margaret came down to visit him during 1954 Rose-Beth Woolley quite often came with her. In April 1955 Margaret spent a week living at his house. Margaret corresponded affectionately with her family; they called each other on the telephone occasionally; and Margaret always brought presents to her nephews and nieces. Margaret never expressed to Mrs. Fitzpatrick or to her brother any of the thoughts and feelings that Dr. Pokrass testified she expressed to him, nor did Mrs. Fitzpatrick or her brother, or any witness on either side, notice any of the other outward signs or the manifestations of retardation which were so visible to Dr. Pokrass.

Dr. Roche, who is another eminently qualified psychiatrist, never saw Margaret Duross. However, he testified that based upon the testimony of Dr. Pokrass, Mrs. Fitzpatrick and George Duross, Margaret was suffering under a form of manic depressive psychosis; that she was subject to a delusion at the time of the execution of her will; that it was his "belief" that such delusion controlled the subject matter of the will and the manner of its execution; and it was his "belief" that if she had not suffered from such mental illness she would not have written such a will as she actually did.

That was the contestant's case.

Dr. William M. Lutz, another eminent psychiatrist who has been on the staff of Wernersville State Hospital from 1946 until the present time, had lunch in the hospital cafeteria almost daily with Margaret Duross and discussed the problems of the hospital with her at those times, as well as at other times. Dr. Francis

E. Weatherby, another eminent psychiatrist since 1913, is Clinical Director of the Women's Service at Wernersville State Hospital and resides there. His duties required him to see Margaret Duross several times a week. Mrs. Betty J. Keppley was the switchboard operator and receptionist at the Hospital from 1941 until August 1947, and from 1953 until the present time. Mrs. Virginia E. DeLeo was the head nurse at the hospital where she had been employed since November 1937. During part of this period she resided with Margaret Duross. Mrs. Keppley and Mrs. DeLeo were social friends, as well as hospital associates, who talked with her daily. All of these witnesses knew Margaret Duross well. Each of them testified *in detail* about the very important position Margaret held as head of the occupational therapy department of Wernersville State Hospital since 1946; how ably she performed her duties, which included the supervision of a number of workers—usually 12 to 18 in number—and the planning of the activities of 800 to 900 patients, as hereinabove more particularly described. All four witnesses testified that there was no change in Margaret's duties or in her activities or her daily contacts or in the functioning of the occupational therapy department of the hospital in August 1954. Furthermore, none of the doctors or other witnesses ever saw the signs of retardation of thought or speech or saw or heard the symptoms narrated by Dr. Pokrass.

Dr. Lutz, Mrs. Keppley and Mrs. DeLeo testified that Margaret was enthusiastic about her work, including the summer of 1954, and that she was very interested in ballet, the theater, music, plays, bridge, arts and crafts, and matters in general. Margaret was a very good bridge player, including the period of August 1954. Mrs. Keppley and Mrs. DeLeo testified that all the office force liked and respected Margaret; that

she was always included in the office force parties; that she had a lovely home and both it and the lawn and shrubbery, which she personally kept, were always neat. They further testified—exactly contrary to Dr. Pokrass—that Margaret was immaculate; her uniforms were spotless; her hair was always in place; she was very meticulous about her person, not only when she was in, but also when she was out, of uniform.

Dr. Lutz testified that a manic depressive psychotic in the acutely depressed stage "is markedly retarded, finds difficulty in thinking, has difficulty in expressing himself. They show retardation of physical activity, find it difficult to do their work and get about. In other words, they are incapacitated in everyday activities and in addition, they suffer marked emotional depression. A person in the acute phase of the depression has symptoms and signs. . . . symptoms are something which a patient tells you. Signs are something that you see. . . . they are the type that can be observed by an individual such as [a psychiatrist] or anyone else . . . ."

Dr. Lutz and Dr. Weatherby testified, based upon their knowledge and experience, and their almost daily conversations with Margaret, that she was not suffering from an insane delusion, nor did she have any retardation of speech or thought. They also testified that if Margaret had had the retardation of speech and thought and the feelings which Dr. Pokrass described, they would have seen objective signs and manifestations of them.

Margaret discussed with Mrs. DeLeo many times her family and how fond she was of them; her visits to her family; and what she had done or intended to do with her property. She mentioned several times that she was anxious to have Miss Woolley come to work in the hospital and live with her, and that she

intended to take care of her in her will so that when Miss Woolley became elderly she would not have to be financially dependent on someone else.

Arthur L. Eckert was cashier of the Wernersville office of the Peoples Trust Company in 1954, having been associated with the bank for 41 years. Margaret Duross maintained a checking account, a savings account, an account of the hospital known as the Occupational Therapy Account; she likewise had a safe deposit box, an amortized mortgage with the bank, and fire insurance. Margaret personally made a number of deposits or withdrawals each month, including August 23, 1954; she regularly made her mortgage payments; she personally clipped her coupons, and took care of all of the accounts; and all of the accounts were accurately kept.

Rose-Beth Woolley, the residuary legatee, went to Abington Elementary School commencing in 1916 with Mrs. Fitzpatrick and Mrs. Hendricks. Their sister, Margaret Duross, was two years younger. Commencing in 1926 Margaret would visit Miss Woolley about every 2 or 3 weeks and spend a week-end with her. In June, July and August, 1954, Miss Woolley saw Margaret every other week, and in August 1954 they took their vacation together at a craft school in Vermont.

The Chancellor or hearing Judge, President Judge MUTH, analyzed and reviewed the testimony and the law in a lengthy and very able opinion from which we quote the following brief excerpts:

"A careful consideration of all the evidence in the case convinces us that Margaret A. Duross, the testatrix, on August 23, 1954, was not the victim of an insane delusion or monomania and that her will of the said date was not the result of any such insane delusion. . . .

"However, if the mental condition of the testatrix on August 23, 1954, could be described as an insane delusion such as would entitle a jury or a court to set aside her last will and testament, nevertheless, there is no evidence that the last will and testament of Miss Duross was in any manner influenced or the result of her mental attitude. If the testatrix had the feelings and thoughts referred to in the testimony of Dr. Pokrass, it certainly does not appear that these mental reactions manifested themselves in the writing of the testatrix's will, since she appointed her brother the executor of her will and her best and closest friend as the beneficiary. . . .

"In order to justify the setting aside of a will upon the grounds submitted, there must be evidence not merely that the testatrix was the victim of a delusion, but that she was controlled by the delusion in the making of the will, and was led by it to improperly disregard her next of kin. The record fails to show any evidence to this effect."

If and when an insane delusion exists, the will itself must be examined and all pertinent circumstances considered, in order to determine whether the delusion controlled the making of the will and caused it to be written very differently from what it otherwise would have been.

Even if Margaret Duross had the insane delusion which was attributed to her by Dr. Pokrass, namely, a feeling that she was inadequate and she hated everybody and everybody hated her, this would not warrant the *legal* conclusion that such an insane delusion was the motivating cause of this will, nor would it legally justify setting aside the will on the ground that it was the product of this insane delusion. Margaret Duross did not leave her estate—hating and being hated by everybody—to a Home for homeless cats, or even to

a Church or Charity; she left it to her best friend, who was unmarried and whom she wanted to financially aid and protect. Moreover, she appointed one of her brothers executor of her will; and, as above mentioned, she left part of her property, viz., her retirement fund of $3543, to her sister, Mrs. Hendricks, and a $10,000 insurance policy to her nephews and nieces, four of whom were children of the contestant, Mrs. Fitzpatrick.*

Where insane delusions do exist, but the will itself shows that they did not control the will or were not the cause which motivated and influenced the decedent's disposition of his estate, the delusions have no relevancy and cannot invalidate the will: *Ross's Appeal*, 243 Pa. 119, 89 A. 816; *Guarantee Trust & Safe Deposit Co. v. Heidenreich*, 290 Pa. 249; 138 A. 764; *Englert v. Englert*, 198 Pa. 326, 47 A. 940; *Johnson Will*, 370 Pa., supra.

In *Guarantee Trust & Safe Deposit Co. v. Heidenreich*, 290 Pa., supra, the testator, Heidenreich, was a retired farmer 83 years of age. "Heidenreich was, to use a common expression, 'crazy'." He had an insane delusion on the subject of religion and marriage. His doctor testified that in his opinion testator was unable to make a valid will at the time of his last will because he was then afflicted with senile dementia, a progressive malady.

The Court said (pages 254, 257): "The doctor's opinion that testator was unable to make a valid will in 1917, because of a progressive disease, is wholly inconsistent with the fact that for nearly three years thereafter he actually did a large amount of business. In a will contest the opinions of witnesses, lay or ex-

---

* It cannot reasonably be said that this was an unnatural disposition of her property.

pert, are of little value when confronted by established facts: Draper's Est., 215 Pa. 314; Kane's Est., 206 Pa. 204. . . . it clearly appears that testator's mind was sound as to matters of business, while a finding that he had delusions as to religion and matrimony would be warranted. Delusions, however, will not affect the validity of a will unless it is influenced thereby. 'A person whose mind is perverted by insane delusions with reference to one or many subjects, however unreasonable and absurd, may nevertheless make a valid will provided the provisions of such will are not influenced by such delusions': Shreiner et al. v. Shreiner, 178 Pa. 57; see also Doster's Est., 271 Pa. 68; Englert v. Englert, 198 Pa. 326; Thomas, Exr., v. Carter et al., 170 Pa. 272; Taylor, Exr., v. Trich et al., 165 Pa. 586; and Watmough's Est., 258 Pa. 22, 28. There is no evidence that testator was under any delusion as to his property, or kindred. Neither the clergymen, the church, nor the one he desired to marry, is mentioned in the will; his entire estate being given to his children and grandchildren, all of whom were named therein. Hence, as the delusions were entirely aside therefrom they are unimportant."

The cases cited by the contestant are not only clearly distinguishable, but *well* illustrate what the law means by "an insane delusion which is sufficient to set aside a particular will."—*Bitner v. Bitner*, 65 Pa. 347; *Taylor v. Trich*, 165 Pa. 586, 30 A. 1053; *Thomas v. Carter*, 170 Pa. 272, 33 A. 81; *Power v. Overholt*, 257 Pa. 254, 101 A. 733; *Leedom Estate*, 347 Pa. 180, 32 A. 2d 3; *Weiss Will*, 366 Pa. 456, 77 A. 2d 422. In each of these cases testator's will was set aside because of an insane delusion which was directed, not against all mankind, but against the particular child or children or relative who was disinherited by the will.

508

Moreover, the appellant-contestant is met with a further insurmountable barrier. Appellant and appellees agree that the power of the hearing Judge or Chancellor is governed by the Orphans' Court Act of 1951, August 10, P. L. 1163, as amended in 1956 by P. L. 1022, 20 PS 2080.745(a). That amendment reads as follows: "(a) Will Contest. When a substantial dispute of fact shall arise concerning the validity of a writing alleged to be testamentary, any party in interest shall be entitled to a trial of this fact by a jury, but the verdict of the jury shall be conclusive only if the court is satisfied with the justness of it on the basis of all the evidence. *If the court is not so satisfied, it may set aside the verdict, grant a new trial or enter such other judgment as satisfies its conscience.*"

The Comment of the Joint State Government Commission to this Amendment is as follows: "Comment— 1956 amendment—As amended, this subsection is intended to re-introduce the rule of Stewart Will, 354 Pa. 288, 295; Williams v. McCarroll, 374 Pa. 281, 297; and Fleming's Est., 265 Pa. 399, and make it clear that the orphans' court has control over the verdict."

In *McGuigen Estate*, 388 Pa. 475, 131 A. 2d 124, the Court said (page 482): "'. . . in ascertaining the legislative meaning, . . . the report of a legislative commission or a Senate or House committee may, if obscurity or ambiguity exists, be considered: National Transit Company v. Boardman, 328 Pa. 450, 197 A. 239; Tarlo's Estate, 315 Pa. 321, 172 A. 139.'"

This amendment, as the Commission correctly states, was intended to reinstate the law as it was set forth in *Williams v. McCarroll*, 374 Pa., supra, and in

*Stewart Will*, 354 Pa. 288, 47 A. 2d 204, i.e., that the verdict of a jury is advisory only and the hearing Judge or Chancellor, if he is not satisfied with the justice of the verdict on the basis of all the evidence, may set aside the verdict and grant a new trial or enter a judgment non obstante veredicto or enter such other judgment *as satisfies his conscience upon a consideration of the entire record.*

Appellant has misunderstood the decision in *Williams v. McCarroll*. In that case the Court, quoting from *Stewart Will*, 354 Pa., supra, said (pages 298-299) : " '. . . But, in the trial of an issue devisavit vel non, where the trial judge sits as a chancellor, his conscience must be satisfied with the justness of the verdict on the basis of all of the evidence. If the chancellor is not so satisfied, he may set aside the verdict even though it might otherwise be found sustainable solely upon the facts and inferences most favorable to the verdict. . . .'

"The test to be applied by an appellate court in reviewing the entry by a Chancellor or hearing Judge of a judgment non obstante veredicto in favor of the proponents of a will following the verdict of a jury on an issue devisavit vel non, is not whether the appellate court would have reached the same result, had it been acting as Chancellor and seen and heard the witnesses, ' "but rather whether a judicial mind, on due consideration of the evidence as a whole, could reasonably have reached the conclusion of the chancellor . . ." ': Shuey v. Shuey, 340 Pa. 27, 32, 16 A. 2d 4. See also to the same effect: Noble's Estate, 338 Pa. 490, 492, 13 A. 2d 422; Dible's Estate, 316 Pa. 553, 554, 175 A. 538; Roberts Will, 373 Pa., supra; Stewart Will, 354 Pa., supra; Phillips' Estate, 244 Pa., supra; or as is sometimes expressed, 'the chancellor's decision will not be reversed unless an abuse of discretion on

510

his part appears': Dible's Estate, 316 Pa. 553, 175 A. 538; Doster's Estate, 271 Pa. 68, 113 A. 831; Mark's Estate, 298 Pa. 285, 148 A. 297; Fink's Estate, 310 Pa. 453, 165 A. 832."

Applying this test, we find no abuse of discretion.

The Decree non obstante veredicto is affirmed; costs to be paid by appellant.