## Meyer Estate

Before KLEIN, P. J., BOLGER, LEFEVER, SAYLOR, SHOYER AND BURKE, JJ.

*Edmund Pawelec*, for exceptants.

*Charles Morris Hamilton, Rambo & Mair, Walter C. Wright, Jr.* (of the New Jersey Bar), and *W. Albert Sanders*, contra.

SHOYER, J., April 11, 1967.— . . . The testimony establishes that decedent was 68 years of age when he died. Decedent's formal education did not go beyond the Northeast Manual Training School in Philadelphia. He was once employed as a pattern maker at Cramp Shipyard and later, for many years, at the Philadelphia Navy Yard, where he became a supervisor or leadman, and a teacher. He died on a Sunday

at the Episcopal Hospital, and the following Monday morning, his three longtime friends, Messrs. Stiles, Roach and Sheetz, went to decedent's home, where he had lived alone, at 409 E. Montgomery Avenue. Mr. Stiles came to obtain clothing for the funeral; Mr. Sheetz, a realtor and director of the Industrial Valley Bank, to see if he could find a will and to obtain the key to decedent's safe deposit box.

In looking through the bureau in decedent's bedroom, Mr. Sheetz found some keys, with one of which he opened up a tool chest which was at the foot of the bed. On the top tray of the tool chest, Mr. Sheetz found four papers (P-1 to P-4 inclusive), all folded together transversely, resulting in three portions or sections, so that when the folds were opened, the papers appeared in the order numbered in the proceedings before the register, i.e., "P-1" (page 2-A-2 and page 2-A-3) and "P-2" (page 2-A-4). In addition, between pages 2-A-2 and 2-A-3 of exhibit P-1, there was a copy of decedent's prearranged funeral contract with Stiles dated March 8, 1963, marked P-3 before the register, but not admitted to probate. Another piece of paper, a calendar page, marked P-4 before the register, but not admitted to probate, which lists some assets of decedent, was also folded into these papers after P-2. None of these papers was physically attached to another. Mr. Sheetz delivered all these papers, together with the key to the safe deposit box, to the bank that morning. The safe deposit box did not contain any testamentary writings. Exhibits "P-3" and "P-4" were admitted into evidence before me.

Comparison of the writing on "P-4" with the data on the bottom of 2-A-4 reveals that 2-A-4 contains, inter alia, substantially the same information almost word for word. It would seem that decedent had used the back of the calendar sheet (P-4) to make notes, and then had transferred this data to his formal will,

the reference to "Cemetary Deed No. 2652" appearing on page 2-A-2 as noted hereinafter in his funeral directions.

Exhibits P-1 and P-2 are each of the same white copy book paper folded lengthwise on the left hand side, each exhibit consisting of 4 pages (not numbered) measuring 7 inches wide and 8½ inches long. Each page contains printed horizontal guidelines for writing and a half-inch vertical ink margin on the left hand side of pages 1 and 3 of exhibit P-1 and on page 1 of exhibit P-2. These margins are self ruled and may well have been inked by decedent, whose occupation describes him as a meticulous pattern maker. Matched holes are punched within the margin, so that each folded sheet could be inserted into a two ring loose-leaf binder.

The writing on exhibits P-1 and P-2 is in ink, and it is admitted by all concerned that it is solely the handwriting of decedent.

Page 1 of exhibit P-1 (2-A-2) provides:

"1409 E. Montgomery Ave. Phila. 25, Feb. 28, 1963

"I Charles J. Meyer, Jr. of the City of Phila., State of Penna. being of sound mind make this my last will and testament. I am to be buried by Jos. Stiles Funeral Directors in East Cedar Hill Cemetary [sic] Deed No. 2652 lot 114, Sec. 7, my name and date of death is to be engraved on the existing stone marker, the lot is to be placed under perpetual care, all this is not to exceed 'Two Thousand dollars' — $2,000.00. After the payment of my just debts and funeral charges I devise and bequeath as follows . . ."

There then follow on this page 2-A-2 of P-1 six numbered paragraphs making gifts aggregating in excess of $112,000, including $10,000 and an automobile to his nephew, John W. Meyer, and $5,000 to each of this nephew's children; $10,000 and decedent's home, furnishings and tools to decedent's other nephew, Charles

F. Meyer, and $5,000 to this nephew's daughter; $10,-000 to decedent's cousin, Marie Meyer; $30,000 to the Masonic Home of Pennsylvania; $5,000 to Ivanhoe Lodge F. & A. M.; and, at the bottom of the page:

"6th. To my very good friends, Mr. & Mrs. Alvin Mason of Erma, R.D.#1, Cape May, N. J. 'Ten Thousand Dollars' each, Lena and Alvin ——— $20,000.00

"Charles J. Meyer Jr."

The next page, 2-A-3 of P-1, entirely holographic, provides:

"7th. To the First Presbyterian Church of Kensington 418 E. Girard Ave., Phila. 25, Ten Thousand dollars ——————— $10,000.00 for an endowment fund.

"8th. To the Atonement Lutheran Church of E. Montgomery Ave. Phila. 25, One Thousand dollars ——————— $1000.00

"9th. ~~Residury~~ Residuary Bequest: All the rest, residue and remainder of my estate both real and personal I give to the Masonic Homes of Penna. 3333 N. Broad St. Phila. 40.

"10th. The Rev. Earl Tyson of the First Presbyterian Church of Kensington is to act as co-executor with the Industrial Valley Bank, 1944 N. Front St. Phila.

"11th. My safe deposit Box is located at Industrial Valley Bank, 1944 N. Front St. Phila.

"12th. To the following friends I give $1000.00 each, if living if any one should die before me his share shall go to the Masonic Home 3333 N. Broad St. Phila. ...", and then follow the names and addresses of seven friends, each bequeathed $1,000.

The handwriting ends about three inches from the bottom of this page.

P-2 (page 2-A-4), entirely holographic, is headed "ESTATE INVENTORY of Charles J. Meyer, Jr., Feb. 28, 1963 . . ." and there is listed, item by item, decedent's assets filling the entire page, and at the

very end decedent's signature, "Charles J. Meyer, Jr." . . .

In the instant matter, as in Covington, the papers admitted into probate are identical in form, texture and age, and were unquestionably obtained from the same source, for even the ring holes in P-1 (2-A-2 and 2-A-3) match those in P-2 (2-A-4). The marks caused by folding the papers in the sequence testified to, i.e., P-1 (2-A-2 and 2-A-3) on top and P-2 (2-A-4) underneath could well have resulted if these papers were so folded. The so-folded papers were found in decedent's locked tool chest. Both first pages (P-1 2-A-2 (face sheet) and P-2 2-A-4 (face sheet)) are dated February 28, 1963, the same date, unlike the papers in Van Gilder, supra, where each bore a later date. Each of the three papers is entirely holographic, none of the three papers containing any writing except decedent's; paragraphs "7th", "8th", "9th", "10th", "11th", and "12th" are written in the same manner and appear in sequential context on page 2-A-3 of "P-1", as the preceding paragraphs ending with "6th" on page 2-A-2 of P-1. And P-2, which begins as "ESTATE INVENTORY . . .", recites, inter alià, that "I own the residence located at 1409 E. Montgomery Ave., Phila., 25 Pa. . . ." which is the same address recited at the beginning of P-1 (2-A-2) and is the home which in item 2nd of P-1 (2-A-2) was given by decedent to his nephew, Charles F. Meyer.

Having already written his name in signature form at the top of page 2-A-2 of exhibit P-1 and at the top of page 2-A-4 of P-2, what other reason could the decedent have had for affixing his signature at the bottom of P-2, except as it be the end of his will! If it was not intended by testator that this signature embrace all that preceded, including P-1, with which it was entwined, and thereby impart a settled testamentary purpose to the disputed sheets as a single integral

document, "then this act becomes incomprehensible": Van Gilder Will, supra, pages 530-31. The fact that page 2-A-4 (P-2) is entitled "ESTATE INVENTORY" and lists decedent's assets does not violate any statutory mandate nor rule of law which would preclude its probate as a constituent part of the testamentary document. An inventory may not be necessary to a complete and valid will. Where testator lives alone, however, it is a sensible, thoughtful and meaningful expression of his testamentary intent to include an inventory as an integral part of his holographic will. . . .

It has been pointed out that decedent *did not* affix his signature to page 2-A-3 of P-1, and there is a blank space there. The argument is advanced that the will is unfinished, that this is the sequential end and it is unsigned, as required by section 2. In Grier Estate, 403 Pa. 517 (1961), the court was obliged to consider the blank space before testator's signature. The court said, page 526:

"The only permissible inference to be drawn from the will itself, as to the purpose of the blank space, is that the testator could later type therein the names of additional beneficiaries with monetary allocations to each, just as he unquestionably did in at least one instance". The Supreme Court held that the orphans' court en banc had drawn the unwarranted inference that testator either wholly forgot to complete his will or died before he could make up his mind.

There is no evidence in the instant case that the several bequests of $1,000 each appearing in item 12th on page 2-A-3 of P-1 were added at a date after item 9th (the residuary clause), item 10th and item 11th were written on the dates appearing on page 2-A-2 and page 2-A-4. In fact, all the writing on page 2-A-3 appears in the same color ink and style as does the writing on the first and last sheet of the probated document. Whether this decedent left the vacant space

in order to insert additional bequests at a later date is of no material significance. . . .

## OPINION SUR EXCEPTIONS

BOLGER, J., June 23, 1967.—The essence of the exceptions is that the writing identified as P-2 and signed by testator was not part of his will and, therefore, the will was not signed at the end thereof as required by section 2 of the Wills Act of April 24, 1947, P. L. 89, 20 PS §180.2.

The hearing judge has clearly and comprehensively stated what can well be regarded as the undisputed facts. Emphasis must be placed upon certain elements thereof: All of the writings are holographic; there were no subscribing witnesses; the writings were found in testator's possession; there is no allegation or suspicion of fraud or tampering; testator was a precise and meticulously careful man; the pages were found wrapped together in the order recited; they are physically similar; the disputed page bears the same date as the first page and both of those pages bear testator's signature at the bottom; the second dispositive page (physically attached to the first page) is unsigned; the title on the disputed page is "Estate Inventory of Charles J. Meyer, Jr." and the executors named were unfamiliar with the extent of decedent's assets.

The learned hearing judge made the following conclusions of law: (1) Animus testandi was indicated by an obvious intention of decedent to die testate and dispose of his property; (2) the provisions appearing on P-1 (pages 2-A-2 and 2-A-3) and P-2 (pages 2-A-4) constitute a coherent, harmonious and complete testamentary disposition, all parts of which fit together in the order probated as an integral part of the decedent's will; and (3) the disputed papers were signed at the end thereof and were, therefore, properly admitted to probate.

Is the page entitled "Estate Inventory of Charles

J. Meyer, Jr.", Exhibit P-2 (2-A-4), a part of the will? If it be thus established as part of the will, being the last page and signed at the bottom, we must then hold that the will was signed "at the end thereof".

We are unanimous in sustaining these findings of fact and conclusions of law. Such of the findings as are in dispute are not only fully supported by the evidence, but are not even remotely contradicted or contested. We, therefore, sustain them: Fiore v. Fiore, 405 Pa. 303 (1961); Pavlinko Estate, 399 Pa. 536 (1960).

The conclusions of law are cogently supported by the cited authorities, principally Covington Estate, 348 Pa. 1 (1943); Van Gilder Will, 421 Pa. 520 (1966); Merryfield's Estate, 167 Cal. 729, 141 Pac. 259 (1914).

Section 2 of the Wills Act of 1947, supra, must be strictly applied. The reason for this strict application of the act is to prevent the possibility of fraud, or the withdrawal or substitution of papers in cases where as here there are several disconnected pages not physically attached: Brown Will, 419 Pa. 418 (1965), and cases cited therein. The hearing judge has incontestably found that not only is there no suspicion of fraud present in this case, there is no allegation thereof. We must, therefore, concern ourselves with endeavoring to determine testator's intent. This intent, therefore, becomes a prerequisite to the application of the statute. Did decedent intend P-2 to be part of his will?

In Baker's Appeal, 107 Pa. 381 (1885), it was stated: " . . . a will is to be read in such order of pages and paragraphs as the testator manifestly intended. . . . " In Keefer Estate, 353 Pa. 281 (1946), it was held that actual testamentary intent is the answer to the question: What was testator's will? In Fisher's Estate, 283 Pa. 282 (1925), the court stated: "Though separate papers may be joined and probated as a will, provided it clearly appears they were intended to be used as a finished whole (Wikoff's App.,

15 Pa. 281), the real desire of the decedent [testator] must be made to appear, and the facts proven must eliminate the possibility that any alteration in the written words had been made. . . ." Van Gilder Will, supra, stated the principle that once it is concluded that the disputed sheets are not spurious, the only purpose of the Wills Act of 1947, P. L. 89, sec. 2, that a will be signed at the end thereof, is the exclusion from probate of documents which do not manifest certainty as to testator's completed testamentary disposition.

In discussing what is the end of the will, the law is that it is not the physical end of it, but the logical and sequential end. In Brown Will, supra, it was held that the question of whether testator signed his will "at the end thereof" is a question of law, and not what testator intended—it is what testator actually did or failed to do. In Miller Will, 414 Pa. 385 (1964), it was held that the end of the will is the place selected by testator as the logical and sequential end of his dispositive act and at which he writes his testamentary signature.

Since the probated papers are holographic and were found in testator's possession, we must advert to the well known aphorism, as employed in will construction cases, that no will has a brother, in order to determine what is testator's completed testamentary disposition, or, as stated in Fisher's Estate, supra, whether it clearly appears that the separated papers were intended to be a completed whole. In Van Gilder Will, supra, Baldwin Will, 357 Pa. 432 (1947), Ziegler Estate, 356 Pa. 93 (1947) and Lippincott's Estate, 276 Pa. 283 (1923), that aphorism was employed in this type of case—the doctrine being that each case must be examined in the light of its particular facts and that, under varying circumstances, the particular principles applied to one set of facts do not necessarily control an entirely different factual situation. In other words, each case of this type is sui generis.

In the ascertainment of testator's intention in this respect, certain positive and negative guidelines are laid down in the hereinbefore cited cases as well as other pertinent ones. The different pages of a will, if not physically united, must be connected by their internal sense, by coherence or adaptation of parts and, as added by Justice (later Chief Justice) Stern, in his concurring opinion in Covington Estate, supra: "The separate pages of the will are 'connected by their internal sense and by coherence or adaptation of parts' within the meaning of the rule if they do not contain any mutual inconsistencies or contradictions, or any repetitions, but, when read as a whole, constitute a harmonious scheme of testamentary disposition all the parts of which fit together without incompatibility or 'incoherence' ".

We disagree with and dismiss the argument of exceptants that because the disputed page does not contain any dispositive or administrative provisions and does not even contain any inchoate testamentary expressions it cannot be admitted to probate. We would be required, if we followed this argument, to isolate the disputed page from the other writings which accompanied it. While it is completely possible or probable that if the disputed page were the only one offered for probate, it might well have been rejected, the disputed page must, under the circumstances, be associated with the other writings in the ascertainment of whether they all comply with the above enunciated rules.

In 94 C. J. S. Wills §1 (1956), it is stated that "*a will is the legal declaration of a man's intentions which he wills to be performed after his death* or an instrument by which a person makes disposition of his property to take effect after his death". (Italics supplied.) This is the law in Pennsylvania: Sando Will, 362 Pa. 1 (1949) ; Pagel Petition, 13 D. & C. 2d 725 (O. C. Phila.

1958); 6 Hunter, Pa. O. C. Commonplace Book, Wills 198, §§1(c) and (d).

We are of the opinion that the disputed page clearly evidences testator's animus testandi as part of the administrative provisions of his will. It was found as the last of the several pages admitted to probate. The fact that he signed it and did not sign page 2 (a dispositive page) indicates that this precise and meticulously careful man, in writing the disputed page and entitling it "Estate Inventory of Charles J. Meyer, Jr." (which, incidentally, contains 28 different items in neat handwriting), although without much formal education and possibly ignorant of the technical requirement that a will be signed at the end thereof, nevertheless was imbued with the desire that his testamentary wishes enumerated therein be carried out. We agree with the learned hearing judge that the disputed page embodies a most unusual procedure. Decedent had on the previous page nominated his minister and the Industrial Valley Bank and Trust Company as his executors. In light of the fact that the two named executors were ignorant of the nature and extent of decedent's estate, they would find it helpful in satisfying themselves as well as the beneficiaries of exactly what comprised the estate. Without this information, they might have been at a loss to determine the extent of the estate and, as a consequence, have to make extensive and exhaustive investigations. It can also be assumed that he wanted to evidence to the law and to all interested parties that he was possessed of testamentary capacity by manifesting that he knew the extent of his estate. Gauged by the positive and negative criteria laid down by the cited authorities, we are completely satisfied that the disputed page was properly admitted to probate.

Exceptants rely chiefly upon Baldwin Will, supra, and cases cited therein. All of these cases are clearly

inapposite. In Baldwin Will, Justice Allen M. Stearne distinguished the facts therein from Covington Estate, supra, cited by Judge Shoyer. In Baldwin, the several writings on several pages were found in a conspicuous part of a desk drawer following testator's death, nine days subsequent to a presumably thorough but futile search of the same desk. It was clear that the papers had been removed earlier and returned by some unknown person. Therefore, the basic element of the possibility of fraud existed. Furthermore, the writings were held not to be associated coherently or by their internal sense and provided full opportunity for withdrawal or interposition of other papers. Another fatal element was that after being discovered, the vital page containing the signature of testator fell from among the other papers, and its position among them, therefore, could not be definitely established as the last of the pages.

The beneficiaries of the provisions on the undisputed first page of the will did not file exceptions to the rejection by the learned hearing judge of their contention that even though the signature on the disputed page was not a signing "at the end of the will", nevertheless the first page was admittedly signed by testator and that such signature would substitutionarily serve as a signing at the end of the will. The learned hearing judge stated that in his opinion, this signature of testator was merely for purposes of identification. It is observed that a major part of testator's benefactions were contained on the second page of the will, which was unsigned. While we are not required, because of the absence of exceptions, to pass upon this point, we will discuss it. These parties point out that the first exception to section 2 of the Wills Act, supra, reads as follows:

"(1) WORDS FOLLOWING SIGNATURE. The presence of any writing after the signature to a will, whether

written before or after its execution, shall not invalidate that which precedes the signature". See Casto Estate, 73 D. & C. 306 (O. C. Del. 1950), and Shields Will, 28 D. &C. 2d 489 (O. C. Butler 1962). This argument is fallacious. We would sustain the hearing judge on this point had exceptions been filed because there can be only one end to a will. The cited section of the Wills Act presupposes that any will containing such provisions is signed "at the end thereof". Page 1 is not the end of this will.

For the foregoing reasons, the exceptions are dismissed and the decree of the hearing judge is sustained.