Baldwin Will.

Argued May 27, 1947. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

rear-ment refused November 10, 1947.

*John C. Bane, Jr.,* with him *Park J. Alexander, John B. Nicklas, Jr., Paul J. Winschel* and *Reed, Smith, Shaw & McClay,* for appellants.

*John R. Bredin,* with him *Dalzell, McFall, Pringle & Bredin,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, October 2, 1947:

The sole question presented by these appeals is whether the paper writing presented to the register of wills for probate complies with section 2 of the Wills Act of 1917, June 7, P. L. 403, 20 PS 191, which requires that: "Every will . . . shall be signed . . . at the end thereof . . . " The record was certified to the orphans' court by the register under section 19 of the

Register of Wills Act of June 7, 1917, P. L. 415, 20 PS 1982. That court, with one judge dissenting, decided that the writing had *not* been executed as required by the Wills Act. The register was directed to refuse probate. The appeals followed. No substantial dispute is presented concerning the principles of law enunciated by this Court relating to the statutory requirement, nor are the facts in controversy. The narrow question is whether the law was correctly applied to the proven facts.

Decedent, an elderly widow, who lived alone, was found dead in her residence in Pittsburgh on June 12, 1944. She is said to have been survived by a sister, nephews and nieces, and grandnephews and a grandniece. Her estate, consisting of real and personal property, is estimated at $80,000. Upon the death, custody of the house and its contents was assumed by Miss Wessell, a close friend and neighbor of decedent, who had been the fianceé of decedent's predeceased son. Miss Wessell immediately notified decedent's sister residing in Akron, Ohio, by telephone, of the death. The sister and certain members of the family came to Pittsburgh and lived in the house until after the funeral. Other relatives also came to Pittsburgh from Ohio, staying with neighbors, but took their meals in decedent's home. With the consent of decedent's lawyer, the sister, upon her return to Akron, turned over a set of house keys to Miss Wessell who thereafter continued in custody of the premises.

On June 19, 1944, the attorney for decedent in company with Miss Wessell, went to the safe deposit box of decedent in a Pittsburgh bank for the purpose of securing decedent's will. The box was opened and the contents examined in the presence of bank officials. No will was found in the box. The lawyer and Miss Wessell then went to the decedent's residence and searched for a will. They looked with particular care in the unlocked bottom drawer of a Winthrop desk in the living room

where decedent had always kept her private papers. No will was found. They made a careful search in the other rooms of the house, but the search was futile.

On July 28, 1944, the register of wills issued letters of administration to a Pittsburgh trust company. On the same day Mr. Williams, a trust officer, in company with two of the trust company's employes, went to the decedent's home for the purpose of securing data for the inventory. While the two employes were listing the household goods, Mr. Williams searched through the Winthrop desk. He testified that he found the three papers (offered for probate) in the bottom drawer rolled up with a gum band around them. The papers in the drawer were "arranged in order; it was not helter skelter." No other articles were piled on top of the papers. They were . . . "lying a little off right center in the middle of the drawer . . . " As the papers were not in the drawer when examined by the attorney and Miss Wessell on June 19th, but were found by Mr. Williams in a conspicuous position in the drawer on July 28th, it is apparent that they had been placed in the drawer between those dates. The learned hearing judge in his opinion said "Counsel for proponent admits that someone took this purported will from the residence of the decedent and then returned it. The record does not disclose the identity of the person or persons who did so."

Mr. Williams testified that when he removed the rubber band he found two long sheets of paper and a one third portion of another sheet. The short sheet of paper with decedent's name affixed (identified as Exhibit 1-C) fell to the floor. The witness was unable to give the sequence of the papers as they were before the rubber band was removed and the short paper fell upon the floor. He stated that he could not say whether Exhibit 1-C (the short paper with the signature) was on top or on the bottom.

We have examined the original writings in the record. Exhibit 1-A is a sheet of paper 8½ inches wide and

14 inches in length. It is a printed legal form titled "Last Will and Testament." The form is filled in in handwriting conceded to be that of decedent. Decedent's name, her city, county and state had been written in. In the printed part, it is declared that decedent was of sound mind and memory, and it is declared that the paper was her last will and testament and revoked all former wills. The first printed item was a direction for payment of debts. Then follows, in decedent's handwriting: "Second: I bequeath to the following:" Then followed a list of beneficiaries and the amounts or descriptions of legacies. On the last line of the page is printed "and I do hereby make, constitute and appoint . . ." On the reverse side of the page is the printed form, left blank, for the naming of the executor, the testimonium clause with space for decedent's signature, and the blank printed form of the attestation clause and lines for the signature of witnesses.

Exhibit 1-B is a paper 8½ inches wide and 10½ inches long. There is no internal reference between Exhibits 1-A and 1-B. This paper is a portion of a similar will form to Exhibit 1-A, with the top of the form torn or cut off. In the handwriting of decedent is a list of bequests, and with a residuary clause. On the bottom of the page, and the last line, is the printed portion for the appointment of an executor. In the blank space is filled in the name of Frederick E. Milligan as Executor. In the printed form on the back or reverse part of the sheet, in decedent's handwriting, are the letters "or" after the printed word "Execut—". In the printed testimonium clause decedent's name is filled in in decedent's handwriting. The paper was not signed by decedent. The line for her signature is blank.

The third or last paper, Exhibit 1-C, is a portion of a printed will form, 8½ inches wide and approximately 4½ inches long, torn or cut off at the top from a larger sheet, but not of the same forms as the other two. It consists of a printed testimonium form, filled in by

decedent, with her name, and dated and signed by her on the line indicated for her signature and seal. The attestation clause is filled in, but decedent's execution was not witnessed.

The requirement of section 2 of the Wills Act, supra, that a will must be signed at the end thereof has a definite purpose. It is an identification by testator and certainty as to his completed testamentary disposition: *Heise v. Heise,* 31 Pa. 246; *Knox's Estate,* 131 Pa. 220, 18 A. 1021; *Churchill's Estate,* 260 Pa. 94, 103 A. 533; *Kimmel's Estate,* 278 Pa. 435, 123 A. 405. The manifest intention of the legislature was to remedy the mischief that arose from admitting to probate memoranda, letters and notes which were mere inchoate expressions of intentions: *Brennan's Estate,* 244 Pa. 574, 91 A. 220. This Court has repeatedly decided what constitutes a signing at the end. The end of a will is the logical end of the disposition in its obvious inherent sense. It is not necessarily the point farthest removed from the beginning: *David S. Baker's Appeal,* 107 Pa. 381; *Morrow's Estate (No. 1),* 204 Pa. 479, 54 A. 313; *Stinson's Estate (No. 2),* 232 Pa. 230, 81 A. 212; *Estate of Bogart,* 96 Pa. Superior Ct. 26.

When wills consist of separate sheets of paper, not physically fastened, perplexing questions frequently arise whether the will was signed at the end as required by the statute. The test was early stated by Chief Justice GIBSON in *Wikoff's Appeal,* 15 Pa. 281, 290: "It is a rudimental principle, that a will may be made on distinct papers, as was held in the Earl of Essex's Case, cited 1 Show. 69. It is sufficient that they are connected by their internal sense, by coherence or adaptation of parts." The question was again raised in *Maginn's Estate,* 278 Pa. 89, 122 A. 264. The rule was stated to be: while a will need not be signed at the physical or spatial end, and pages need not follow in numerical order, there must be the sequence of pages or paragraphs which relates to its logical and internal sense, and the signature

must be placed at the sequential end; and this end must not permit the substitution or interpolation of pages in advance unless they are connected as indicated. Chief Justice MAXEY, in *Covington Estate,* 348 Pa. 1, 10, 33 A. 2d 235, said: "From the leading cases cited from our own State . . . it is established (1) That a valid will may be written on separate, not physically united, sheets of paper only the last one of which is signed; (2) That it is not necessary to the testamentary validity of such papers that a specific reference be made on the signed page to the preceding pages; (3) That for the probate of such papers as a will it is not necessary that the separate sheets be verbally united by the completion on a successive page of a sentence or paragraph begun on the preceding page. . . . (4) That the test . . . is . . . : Are the papers 'connected by their internal sense, by co· herence or adaptation of parts?'" As the rule is so firmly established we need not cite the many cases reviewed in the above cases and attempt to classify or distinguish them. It will suffice to say that each case must be examined in the light of the particular facts. Under varying circumstances, the rule applied to one set of facts does not necessarily control an entirely different factual situation.

Appellants urge that the present case is ruled by *Covington Estate, supra.* This Court was unanimous in reaffirming the principles of law above referred to, but was divided concerning its application to the facts. However, the facts in that case were quite dissimilar to those presently before us. That was a case of a joint will executed by a husband and wife. The will consisted of three sheets of unfastened papers, identical in form, taken from a pad of bill heads used by the husband in his business. They were in handwriting. The first page was titled "Last Will" of decedents. Then followed devises of real estate and bequests of personalty and direction for payment of funeral expenses. The second sheet contained a devise of real estate and personal

property. The third sheet provided for the disposition of proceeds of life insurance, bequest of personal property and gave the combination of the safe. At the end of this sheet appeared the signatures and the date. All three papers were found in a sealed envelope on a kitchen table in the room where the bodies of decedents were found—joint suicides. A majority of the Court decided, on the facts of that case, that the papers were sufficiently ' ". . . connected in their internal sense or coherence by adaptation of parts" ' to establish that the will was signed at the end thereof. The fact that all three papers were enclosed in a sealed envelope was regarded as equivalent to a physical fastening.

The facts in the instant case are distinguishable from those in *Covington Estate,* supra. Here the signed testimonium clause is on a separate detached remnant of paper, and has no internal reference to the two preceding sheets. In *Covington Estate* the signatures were on the bottom and formed part of the third sheet with its dispositive provisions. It is established that here the remnant was not even part of a similar legal form, and of the same printing, as the other two. In *Covington Estate* all sheets were taken from the same bill pad. Furthermore, while in the present case the three sheets were found with a rubber band around them, yet it could not be shown, when the band was removed and after the signed clause fell to the floor, whether the signed testimonium clause was on the top or bottom of the three sheets. Had the signed clause been at the beginning or top, under any circumstance, the alleged will could not be held to have been signed at the end but at the beginning. Such an execution would have been invalid: *Coyne Will,* 349 Pa. 331, 37 A. 2d 509.

There are many circumstances in this case which demonstrate the wisdom of a strict application of the rule. None of the papers has any internal reference to the others. It is remarkable that when decedent appointed an executor, carried over to the back of the

second sheet (1-B), and filled in her name in the testimonium clause she failed to sign her name, but signed a similar form clause on a remnant of a third piece of paper. There could be no discernible purpose in this. Furthermore, it was an extraordinary and unexplained circumstance that the papers mysteriously appeared in an identical place where a careful search had previously been made. It is a conceded fact that the papers had been placed there by an undisclosed person after the first search.

This Court has consistently resisted attempts to weaken or modify the rule requiring execution of a will at the end thereof. Justice KEPHART (later Chief Justice) said in *Maginn's Estate,* 278 Pa. 89, 91, 122 A. 264: "In interpreting the legislature's thought, courts have rigidly opposed any exception tending to weaken the basic principle underlying the law, the chief purpose of which is to see that the testator's wishes are observed. It is possible, in some cases, a 'decedent may have thought he had made a will, but the statute says he had not. The question is not one of his thought in that respect, but what he actually did, or . . . failed to do . . . . "It may happen [that] . . . wills truly expressing the intentions of the testators are made without observations of the required forms; whenever that happens, while the genuine intention is frustrated . . . the legislature . . . has thought it best, and has therefore determined, to run the risk of frustrating that intention . . ., in preference to the risk of giving effect to or facilitating the formation of spurious wills, by the absence of forms . . . . The evil of defeating the intention . . . is less than the evil probably to arise by giving validity to wills made without any form . . ." ', or in derogation of testator's wishes, fraudulently imposing spurious wills on his estate: Churchill's Est., 260 Pa. 94, 101."

In *Brown Estate,* 347 Pa. 244, 246, 32 A. 2d 22, we said: ". . . The Wills Act requires signing at the end. The purpose of the Act was to remove all *possibility* of

fraud. It is most evident that there exists a *possibility* of fraud in such insertions. Even if the testamentary intention of this particular testatrix is frustrated, it is much wiser to refrain from weakening the sound and well-established mandate of the legislature. Were we to do so, we might in future cases, facilitate fraudulent or unauthorized alterations or additions to wills."

The facts of this case have not sufficiently established that the purported will was signed at the end thereof as required by section 2 of the Wills Act, and probate must be refused.

In No. 54 (appeal of Pittsburgh Home for Babies) the appeal is dismissed and the decree affirmed, at the cost of appellant. This conclusion makes it unnecessary to consider whether appellant executor in No. 28 is an aggrieved party entitled to appeal.