### Brown Will.

Submitted October 5, 1965. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Robert L. Webster*, for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, November 9, 1965:

Was the unsigned holographic instrument, dated January 15, 1957, a will?

Carrie Brown died on August 2, 1962, leaving to survive her two sons, four daughters, two granddaughters, and one grandson. On September 4, 1962, Mae Stickel, a daughter of Carrie Brown, applied for Letters of Administration, which were issued to her on that date. On January 30, 1963, Emma Brown, another daughter, came to the Register's Office, (a) paid the inheritance tax,* and (b) offered for probate the following holographic instrument:

---

* On January 29, 1963, the Department of Revenue appraised and valued the property of Carrie Brown, which was subject to Inheritance Tax, at $8,792.93, and the Register of Wills allowed debts and deductions in the total amount of $2,007.60.

"January 15, 1957

I Carrie Brown will all my money property and possessions to Emma and Effie
Effie to be the Executrix

Jessie Brown
Forbes Brown"

The Register at that time and later, after hearing testimony refused to probate the aforesaid holographic instrument.

All parties agree that the instrument was written by Carrie Brown herself, with the exception that the names "Jessie Brown" and "Forbes Brown" were written by them.

The Orphans' Court on November 16, 1964, dismissed the appeal of Effie Brown and Emma Brown (two of Carrie Brown's daughters who were the beneficiaries named in the aforesaid instrument), and affirmed the Register's refusal to probate that holographic instrument as the will of Carrie Brown. From the Court's final Decree, Effie Brown and Emma Brown took this appeal.

Two things are obvious. (1) The writing is testamentary in character, and (2)(a) the name "Carrie Brown" *does not appear at the end* of the writing, but only at the beginning, and (b) her name appears before she made any gift disposing of her property and before she appointed an executrix.

Section 2 of the Wills Act of 1947* provides in pertinent part: "Every will, except nuncupative wills [holographic wills are not included in the exceptions]

---

* Act of April 24, 1947, P. L. 89, §2, 20 P.S. §180.2. Although not referred to by any of the parties or by the lower Court, we have considered §2(1) of the Wills Act. Section 2(1) provides: "Words following signature. The presence of any writing *after the signature to a will*, whether written before or after its execution, shall not invalidate that which precedes the signature."

. . . shall be in writing *and* shall be signed by the testator at the end thereof,* . . . ."

In this kind of a case, the first and most important question—even before the question of the alleged testator's intent—is: Has the alleged testator complied with or failed to comply with those provisions and requirements which the Wills Act says are necessary to constitute a testamentary paper, "a valid will"?

It is clear as crystal that this holographic instrument was not signed by Carrie Brown *at the end thereof* as required by the clear and unambiguous language of the Wills Act, and cannot be probated as her will. Cf. *Glace Will,* 413 Pa. 91, 196 A. 2d 297; *Churchill's Estate,* 260 Pa. 94, 103 A. 533; *Coyne Will,* 349 Pa. 331, 37 A. 2d 509; *Brown Estate,* 347 Pa. 244, 32 A. 2d 22.**

In *Glace Will,* 413 Pa., supra, the testator wrote his name on the front page after the word "I". There then followed a statement that he was of sound mind, memory and understanding and made and published this, his last will and testament, and he then disposed of his estate. After nominating executrices, he signed his name in the testimonium clause after the words "In witness whereof, I". This Court held that said instrument was not Glace's will since it did not comply with section 2 of the Wills Act. The Court pertinently said (pages 94-96) : "The language of the Statute could not be clearer; to constitute a valid will, the writing must be signed by the testator *at the end thereof*—any exceptions, modifications or 'ifs ands or buts' would not only erode but would soon make the statutory requirement meaningless.

. . .

"The law is well settled as to what is meant by the end of a will. . . . ' " '. . . It is possible, in some cases,

---

* Italics throughout, ours.

** We note that *Miller Will,* 414 Pa. 385, 200 A. 2d 284, which was not referred to by anyone, is on its facts clearly distinguishable.

a "decedent may have thought he had made a will but the statute says he had not. *The question is not one of his thought* in that respect, *but what he actually did, or . . . failed to do. . . .*" ' " Baldwin Will, 357 Pa. 432, 440, 55 A. 2d 263, 267 (1947). As early as Wineland's Appeal, 118 Pa. 37, 41, 12 Atl. 301, 302 . . ., Mr. Justice PAXSON rather appropriately remarked: "It says a will must be signed at the end thereof, and that's the end of it." The end contemplated by the Act is not the point which is physically furthest from the beginning of the writing. As we said in Kehr Will, 373 Pa. 473, 479, 95 A. 2d 647 . . .: " 'The end contemplated by the statute is the *logical end of the language used by decedent* in expressing his testamentary purpose,' " or, as was said in Coyne Will, 349 Pa. 331, 333, 37 A. 2d 509 . . .; " '. . . there must be a sequence of pages or paragraphs which relates to its logical and internal sense, and *the signature must be placed at the sequential end.*' " See, also, Baldwin Will, 357 Pa., supra.'

". . . *The question in this case* as to whether decedent signed the writing at the end thereof *is* not one of decedent's intention but of *what decedent actually did or failed to do.*"*

Appellants offered evidence to prove that Carrie Brown came to the home of her son, Forbes Brown, and told him and his wife Jessie that she wanted to leave all her property to her children, Emma and Effie, because they were the ones who took care of her; and she wanted Forbes and Jessie to witness her will. They then signed their names to the aforesaid paper which Carrie wrote. Unfortunately, Carrie did not sign the instrument, either inadvertently, or because she did not know she had to do so, or because she wanted to further consider the matter—the witnesses did not know why. As the Court further said in *Glace Will,* supra

---

* We have been further aided in this case by the very able Opinion of Judge JAMES A. REILLY.

(page 97) : " 'It is perhaps unfortunate that decedent's testamentary intentions are frustrated. The strictness with which this section of the Wills Act must be enforced is a matter of legislative mandate. As we said in Brown Estate, supra [347 Pa.] (p. 246) : "The Wills Act requires signing at the end. The purpose of the Act was to remove all possibility of fraud . . . . Even if the testamentary intention of this particular testatrix is frustrated, it is much wiser to refrain from weakening the sound and well established mandate of the legislature. Were we to do so, we might in future cases facilitate fraudulent or unauthorized alterations or additions to wills." ' "

We cannot substitute imagination or conjecture for statutorily required consummation, nor magically transfer Carrie Brown's signature from the beginning to the end of this instrument.

In the light of the clear and mandatory language of the Wills Act it is impossible to construe this unsigned instrument as the will of Carrie Brown which was signed "at the end thereof."

Decree affirmed; each party to pay own costs.

Mr. Justice JONES concurs in the result.