# Knupp Will.

Argued September 28, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Irving Murphy*, with him *Frederick F. Jones*, and *MacDonald, Illig, Jones & Britton*, for appellant.

*Robert Hampson*, with him *Hampson and Hampson*, for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, November 30, 1967:

The question involved, in the last analysis, boils down to whether decedent signed a purported will *at*

*the end thereof,* as mandated by §2 of the Wills Act of 1947.*

Decedent, a spinster lady 64 years of age and the daughter of an attorney, resided in Warren County, Pennsylvania, where she had a home, and owned absolutely, or jointly with others, real property in Warren, Forest and McKean Counties. She left surviving her, three sisters, all of whom resided outside of Pennsylvania, an uncle who was a beneficiary, and a friend, Helen Nichols, who also was a beneficiary.

The controversial paper was in the *handwriting* of the decedent, except for the signatures of the subscribing witnesses. It was termed at the top "Will March 1, 1952." It commenced, "I, *Montana O. Knupp* . . . do make, declare, and publish the following as and for my Last Will and Testament. . . ." In paragraph "First," she directed the payment of her funeral expenses. In paragraph "Second," she gave to A. J. Knupp her undivided one-half interest in property which she jointly owned. In paragraph "Third," she devised her home and the furniture and personal belongings therein to Helen Nichols, the present appellant, upon conditions which are unnecessary to recite but which make the lawfulness of the devise or its conditions doubtful. In paragraph "Fourth" she gave all the rest, residue and remainder of her estate unto [a blank space]** and further provided therein that certain named property should be sold and her outstanding debts paid out of the proceeds of sale. In the

---

* Section 2 of the Wills Act of 1947, P. L. 89, 20 P.S. §180.2— which re-enacted §2 of the Wills Act of 1917, P. L. 403, 20 P.S. §191, which in practical effect re-enacted the Act of 1833, P. L. 249, §6—provides: "Every will . . . *shall be in writing and shall be signed by the testator at the end thereof.* . . ." (Italics, ours.)

** If this paper is a will, there is no gift of the residuary estate and said estate would descend to decedent's next of kin under the intestate laws.

"Fifth" paragraph she gave to Dorothy Allen, one of the subscribing witnesses, "All the undivided interests with H. M. Honhart, M. V. Connelly." In the "Sixth" paragraph, she appointed Warren National Bank and Knox Harper executors, and further provided therein, "Any person or persons making any claims [even $5 or $10] shall have a claim and I give, devise and bequeath the sum of one hundred dollars to each person or persons."

There then follows the language which causes the present controversy:

"March 2, 1952.

"Signed, sealed, published and declared by the above named Testatrix, *Montana O. Knupp, as and for her Last Will and Testament,** in the presence of us, who at her request and in the presence of her the said Testatrix, and in the presence of each other, have hereunto subscribed our names as witnesses thereto.

Mrs. Ida Goal<br>Dorothy C. Allen"

Approximately a year after her death, an envelope was found which contained the aforesaid written instrument. On the outside of the envelope appeared the following:

"Will of Montana O. Knupp

"Make new one"

Appellant contends this is a valid holographic will. Montana O. Knupp's name appears only in the first line and in the third line of the nine-line attestation clause—not at the end of the will and not even at the end of the attestation clause. Mrs. Goal and Dorothy

---

* Italics throughout ours, unless otherwise indicated.

C. Allen, the subscribing witnesses, signed their names *at the end of the attestation clause* which recited that the testatrix, Montana O. Knupp, had signed and sealed the will in their presence and in the presence of each other. However, neither of these two witnesses actually saw the decedent sign her name in the attestation clause,* and neither of them was present when the other signed her name at the end of the attestation clause.

On November 17, 1965, the Register of Wills refused to probate the aforesaid writing, and on March 6, 1967 the appeal of Helen Nichols was dismissed and the Register's decree was affirmed by the Orphans' Court.

The first and most important question in this kind of a case—even before the question of testator's alleged intent—is, Has the alleged testator complied with or failed to comply with those provisions and requirements which the Wills Act says are necessary to constitute a paper which is testamentary in character, a valid will?

Whatever else may be uncertain, it is clear as crystal that the decedent *did not sign this paper at the end thereof* or even at the end of the attestation clause!

What was written by Miss Knupp on the envelope, even if its meaning were clear and unambiguous, (1) was not a signature at the end of her will in compliance with §2 of the Wills Act; (2) nor was her statement to each of the so-called subscribing witnesses that the paper to which they signed their name was her will, sufficient to make it a valid will, even if there was no doubt of her testamentary intent; (3) nor was the writing, although testamentary in character and in the

---

* One of these subscribing witnesses *thought* the decedent in her presence signed the paper *somewhere,* but she was very vague about it, saying: "It seems, I think, and I can't remember."

handwriting of the decedent, *signed at the end thereof*[*] as required by §2 of the Wills Act. *Churchill's Estate,* 260 Pa. 94, 103, 103 Atl. 533; *Glace Will,* 413 Pa. 91, 196 A. 2d 297.[**] See also, *Brown Will,* 419 Pa. 418, 214 A. 2d 229; *Seiter's Estate,* 265 Pa. 202, 108 Atl. 614; *Kretz Estate,* 410 Pa. 590, 189 A. 2d 239; *Brown Estate,* 347 Pa. 244, 246, 32 A. 2d 22; *Griffith Will,* 358 Pa. 474, 483, 57 A. 2d 893; *Bridge's Estate,* 139 Pa. Superior Ct. 606, 13 A. 2d 125; *Glover Estate,* 80 Pa. D. & C. 310; *Sears v. Sears,* 77 Ohio S. 104.

*Churchill's Estate,* 260 Pa., supra, which has often been affirmed and reaffirmed by this Court, is directly in point and controlling. The facts and the law are well and aptly stated in the Opinion of the Court by Chief Justice BROWN (pp. 100, 101, 102): "The paper admitted to probate in the present case is a printed form of a will, *all the written portions of it being in the handwriting of P. Churchill, the decedent. . . What he did do was to write his name in three blank spaces in the paper—first at the top and then in the testimonium and attestation clauses.* In doing so he was merely acting as his own scrivener; but because he said to one of the two attesting witnesses, 'This is my will, I have signed it,' and to the other, 'I wish you to witness my name to a paper,' and subsequently handed it to a physician, saying, 'This is my will, and I want you to keep it for me,' the learned court below was of opinion that the 'testamentary purpose was complete *and that the signature in the attestation clause meets every statutory requirement of being "at the end thereof."* '

---

[*] As the Orphans' Court aptly said, "When Montana O. Knupp wrote her name as part of the attestation clause she was not signing her will. She was writing out an attestation clause."

[**] For a further detailed statement of the evidence and the facts and the law, see the lengthy, analytical and excellent Opinion of Judge FLICK.

"*The decedent may have thought he had made a will, but the statute says he had not.* The question is not one of his intention, but of what he actually did, or rather what he failed to do. He failed to sign the paper at the end thereof, and this essential requirement of the statute is not met by the insertion of his name in his own handwriting in three blank spaces in the printed form of the paper which he may have intended to use in executing his will. 'It may happen, even frequently, that genuine wills, namely, wills truly expressing the intentions of the testators, are made without observations of the required forms; and whenever that happens, the genuine intention is frustrated by the act of the legislature, of which the general object is to give effect to the intention. The courts must consider that the legislature, having regard to all probable circumstances, has thought it best, and has therefore determined, to run the risk of frustrating the intention sometimes, in preference to the risk of giving effect to or facilitating the formation of spurious wills, by the absence of forms. . . . 'The legislature have laid down a rule so plain that it cannot be evaded without a clear violation of its terms. No room is left for judicial construction or interpretation. *It says a will must be signed at the end thereof, and that's the end of it.* We are of opinion that this paper was not a will within the meaning of the Act of 1833, and that it was error to admit it to probate.' "

*Glace Will,* 413 Pa., supra, is so factually close as to be likewise controlling. In *Glace,* an alderman drew Glace's will which was on a printed legal form. The signature of the purported testator, "George Glace," was *written by George Glace* on the front page after the word "I," *and again in the testimonium clause* after the words "In witness whereof, I." The word "alderman" was written by the alderman at the end of the testimonium clause. The Court said (pages 94, 95, 96) :

". . . Section 2 pertinently provides, 'Every will . . . shall be in writing and shall be signed by the testator *at the end thereof*. . .' The language of the Statute could not be clearer; to constitute a valid will, the writing must be signed by the testator *at the end thereof*—any exceptions, modifications or 'ifs ands or buts' would not only erode but would soon make the statutory requirement meaningless. [Emphasis in original.]

. . .

"The law is well settled as to what is meant by the end of a will. In Kretz Estate, 410 Pa. 590, 189 A. 2d 239, the Court said, 'Since the adoption by the Legislature of the statutory requirement that a will be signed "at the end thereof," "This Court has consistently resisted attempts to weaken or modify the rule. . . . '. . . It is possible, in some cases, a "decedent may have thought he had made a will, but the statute says he had not. The question is not one of his thought in that respect, but what he actually did, or . . . failed to do. . . ."' " Baldwin Will, 357 Pa. 432, 440, 55 A. 2d 263, 267 (1947). As early as Wineland's Appeal, 118 Pa. 37, 41, 12 Atl. 301, 302 (1888), Mr. Justice PAXSON rather appropriately remarked: "It says a will must be signed at the end thereof, and that's the end of it." The end contemplated by the Act is not the point which is physically furthest from the beginning of the writing. As we said in Kehr Will, 373 Pa. 473, 479, 95 A. 2d 647 (1953): " *'The end contemplated by the statute is the logical end of the language used by decedent in expressing his testamentary purpose,'* " or, as was said in Coyne Will, 349 Pa. 331, 333, 37 A. 2d 509 (1944): " '. . . there must be a sequence of pages or paragraphs which relates to its logical and internal sense, *and the signature must be placed at the sequential end.'* " See, also, Baldwin Will, 357 Pa., supra.'

". . .Churchill's Estate, we repeat, governs the instant case. Our conclusion is further supported by

Griffith Will, 358 Pa. 474, 483, 57 A. 2d 893, and Baldwin Will, 357 Pa. 432, 436, 55 A. 2d 263, each of which reaffirmed Churchill's Estate.

"Appellant contends that we should consider and be governed by the intention of the testator in our determination of this matter. Applicable is the succinct maxim, 'Hard cases make bad law'; it could be more accurately expressed: 'Heart-touching claims which appeal to our sense of Justice often beget bad law.' Coyne Will, 349 Pa., supra, well answers appellant's plea (page 334):

" 'It is perhaps unfortunate that decedent's testamentary intentions are frustrated. The strictness with which this section of the Wills Act must be enforced is a matter of legislative mandate. As we said in Brown Estate, supra [347 Pa.] (p. 246): "The Wills Act requires signing at the end. The purpose of the Act was to remove *all possibility of fraud.* . . . Even if the testamentary intention of this particular testatrix is frustrated, it is much wiser to refrain from weakening the sound and well established mandate of the legislature. Were we to do so, we might in future cases facilitate fraudulent or unauthorized alterations or additions to wills." ' [Emphasis in original.]

"The question in this case as to *whether decedent signed the writing at the end thereof* is not one of decedent's intention but of what decedent actually did or failed to do. . . ." [Emphasis in original.]

This was followed by *Kretz Estate,* 410 Pa., supra, where the Court, speaking through Justice ROBERTS, reiterated the applicable principles (pages 592-593, 595, 597): "Eleanor Kretz died June 9, 1961, leaving a five page holographic will dated December 22, 1954. On the last page of the will, below her signature, she had written:

" 'Residuary of the Estate to
go to Esther Fleming
Kathryn Graeff
Bobby Allen
Bersk County Trust Company
Exequatars'

*"No signature appeared following* this writing on the page. The five pages were found in a white envelope on which Eleanor Kretz had written:

'My Last Will
December 22nd 1954
Eleanor Kretz
1201—Perkiomen Ave
Reading Pa
Berks County Trust Company
Exequatars'

"Since the adoption by the Legislature of the statutory requirement that a will be signed 'at the end thereof,' 'This Court has consistently resisted attempts to weaken or modify the rule. . . . Justice KEPHART (later Chief Justice) said in Maginn's Estate, 278 Pa. 89, 91, 122 A. 264: "In interpreting the legislature's thought, courts have rigidly opposed any exception tending to weaken the basic principle underlying the law, the chief purpose of which is to see that the testator's wishes are observed. It is possible, in some cases, a 'decedent may have thought he had made a will, but the statute says he had not. The question is not one of his thought in that respect, but what he actually did, or . . . failed to do. . . .' " ' Baldwin Will, 357 Pa. 432, 440, 55 A. 2d 263, 267 (1947). As early as Wineland's Appeal, 118 Pa. 37, 41, 12 Atl. 301, 302 (1888), Mr. Justice PAXSON rather appropriately remarked: 'It says a will must be signed at the end thereof, and that's the end of it.' The end contemplated by the Act is not the point which is physically furthest

from the beginning of the writing. As we said in Kehr Will, 373 Pa. 473, 479, 95 A. 2d 647 (1953) : ' "The end contemplated by the statute is the logical end of the language used by decedent in expressing his testamentary purpose," ' or, as was said in Coyne Will, 349 Pa. 331, 333, 37 A. 2d 509 (1944) : ' ". . . there must be a sequence of pages or paragraphs which relates to its logical and internal sense, and the signature must be placed at the sequential end." ' See, also, Baldwin Will, 357 Pa., supra.

. . .

"We are convinced that the writing on the white envelope was intended to identify the document enclosed and to recite the date on which it was written, the name of the writer, her residence and the name of the executor, not to serve as a signature to a testamentary disposition of property. Whether Eleanor Kretz thought that what she was enclosing was a valid will, including a disposition of the trust estate, is immaterial. The endorsement cannot be construed, factually, logically or legally, under the Wills Act, to be her signature at the 'end' of her will."

*Miller Will,* 414 Pa. 385, 200 A. 2d 284, upon which appellant relies, is distinguishable because in that case Justice ROBERTS distinguished that will *factually* from the *Churchill* and the *Glace* wills (and other prior will cases) "by Clara Edna Miller's use of the word 'my' in the attestation clause rather than the word 'his' used in Churchill."

After the decision in *Miller Will,* this Court once again reaffirmed *Churchill's Estate,* 260 Pa., supra, in *Brown Will,* 419 Pa., supra. In *Brown Will,* this Court held that the following holographic writing, which was written by the decedent and was testamentary in character and undoubtedly was intended to be her will, was not a valid will because it was not signed at the end thereof. It read:

420

"January 15, 1957.

I Carrie Brown will all my money property and possessions to Emma and Effie

. . .

Jessie Brown

Forbes Brown"

Furthermore, the testimony showed that decedent told Jessie Brown and Forbes Brown that she wanted to leave all her property to her children, Emma and Effie, because they were the ones who took care of her, and she wanted Jessie and Forbes to witness her will. They then signed their names to the aforesaid paper which Carrie wrote. The Court pertinently said (page 421): "In this kind of a case, the first and most important question—even before the question of the alleged testator's intent—is: Has the alleged testator complied with or failed to comply with those provisions and requirements which the Wills Act says are necessary to constitute a testamentary paper, 'a valid will'?

"It is clear as crystal that this holographic instrument was not signed by Carrie Brown *at the end thereof* [emphasis in original] as required by the clear and unambiguous language of the Wills Act, and cannot be probated as her will. Cf. Glace Will, 413 Pa. 91, 196 A. 2d 297; Churchill's Estate, 260 Pa. 94, 103 A. 533; Coyne Will, 349 Pa. 331, 37 A. 2d 509; Brown Estate, 347 Pa. 244, 32 A. 2d 22."

To sustain this handwritten paper as a valid will, we would not only open wide the door to fraudulent or spurious or altered documents, as well as to wills by conjecture and guess or by oral testimony of decedent's allegedly declared meaning and intent, but most important *we would have to ignore or extirpate the statutory mandate* and to overrule our prior decisions that to constitute a valid will every written will must be signed by the testator at the end thereof.

Decree affirmed, each party to pay own costs.

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

The facts of this case convince me that the distinction drawn by this Court between *Churchill's Estate*, 260 Pa. 94, 103 Atl. 533 (1918) and *Miller Will*, 414 Pa. 385, 200 A. 2d 284 (1964), a distinction based solely upon the fact that the word "his" appeared in the attestation clause in *Churchill*, whereas the word "my" was used in *Miller*, is no longer tenable. I would therefore overrule *Churchill*, as well as *Glace Will*, 413 Pa. 91, 196 A. 2d 297 (1964) (which relies on *Churchill*), insofar as those cases *require* use of the word "my" in an attestation clause before a signature appearing therein can be said to have the requisite testamentary intent necessary to validate a will.[1] I believe that the better rule would be to examine *all* the evidence in each case to determine if the testator signed the attestation clause with the requisite testamentary intent.[2]

Although §2 of the 1947 Wills Act requires that a will be signed at the end, it is now clear that the mere presence of language following the signature will not automatically invalidate the entire will. *Miller Will*, supra. Of course, if the language that follows the signature is *itself* testamentary in nature, then the post-signature bequests contained in that language will be

---

[1] Mr. Justice MUSMANNO, concurring in *Miller*, recognized that both *Churchill* and *Glace* should be overruled. This position was subsequently advocated in "Wills-Execution-Signature- 'At the End Thereof.'" Fiduciary Review, June 1964, p. 1.

[2] This rule finds support in Comment, 10 Villanova L. Rev. 196, 200 (1964), where it is stated: "It would seem that in a situation involving a printed will form, completed in the testator's own handwriting, there is a definite testamentary intent which should be honored by the courts, despite the fact that the individual involved failed to obtain counsel and execute the document in strict accordance with the legislative mandate." The comment also notes that only twelve jurisdictions still require that a will be signed at the end to be valid. Id. at 197, n.6.

void. *Kretz Estate,* 410 Pa. 590, 189 A. 2d 239 (1963). Therefore, the core question in the present appeal is whether the signature of Montana O. Knupp was made with *testamentary* intent, or was merely made to *identify* the testatrix in the attestation clause.

I am completely convinced that this signature was made with testamentary intent. In the first place, the will was totally in the handwriting of the testatrix, unlike the documents in *Miller, Churchill,* or *Glace.* Furthermore, both subscribing witnesses testified that the testatrix asked them, to use the language of witness Dorothy C. Allen, "if . . . [they] would witness her Will."[3]

Finally, the other subscribing witness, Ida Goal, testified that when she signed her name as witness, testatrix's name had not yet been inserted in the attestation clause, but that Montana O. Knupp inserted her own signature *after* the rest of the attestation clause had been written out, and after one witness had signed.[4] To me, this is the most convincing indication that the signature was not merely part of the attestation clause, but was intended as a separate testamentary signing. In sum, when it is considered that the will in *Miller,* which this Court upheld, was a printed form containing a special blank line for a signature, and that this line was *never filled in,*[5] I believe that the present case is even more persuasive than *Miller.*

As is so frequently done in this area, the majority defends its position by stating that the purpose of the Wills Act is to prevent fraud, and that a more liberal rule in this case would "open wide the door to fraudulent or spurious or altered documents . . . ." I could not be more convinced that no such fear is justified.

---

[3] Record at 20a.

[4] Record at 30a.

[5] The actual signature appeared as part of the attestation clause just under the blank signature line.

Admittedly, our case law does contain certain rules of construction which can operate to prevent the probate of a document clearly intended as a will. But, in each of these cases, we frustrate the testator's intent today, because an identical document presented tomorrow, drawn by a different testator, could easily be forged. For example, in *Kretz*, supra, we invalidated the residuary clause appearing *after* the testator's signature, not because we believed that *it* was forged, but because to allow probate would be to invite future persons to fraudulently insert similar clauses in other wills. I repeat that no such risk is present here.

Assuming, as is the case here, there are no blank spaces in the body of the will, when a testator signs his name at the end of his testamentary disposition, it symbolically, as well as *physically*, prevents the addition of other provisions prior to the signature. There is simply no room for them. In a sense, the signature acts just as sealing wax on a letter. Not only did Montana O. Knupp's signature at the end of the dispositive provisions of this will insure that no one could have inserted additional terms, but furthermore, a similar signature in any subsequent, similar will would provide identical assurance there. If the majority is concerned with the possibility of some third person altering the document by *changing* provisions, rather than *adding* new ones, then I submit that the choice of pronouns in the attestation clause could have no effect whatsoever on this risk. In fact, such a possibility of fraud is present in every will, no matter how it is signed.

Recently, the writer of this majority opinion announced in *Ehret Estate*, 427 Pa. 584, 596, 235 A. 2d 414, 421 (1967) : "Where reason faileth, both Justice and Respect for the Law are imperiled." I can think of no better time to invoke this doctrine than today.

I dissent.

Mr. Justice JONES and Mr. Justice EAGEN join in this dissenting opinion.