## Treitinger Will.

Argued March 19, 1970.   Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Howard V. Heck,* with him *Fulton and Heck,* for appellants.

*Nick C. King,* for appellees.

OPINION BY MR. CHIEF JUSTICE BELL, October 9, 1970:

In this case, the validity of the will of Joseph Treitinger, deceased, is being contested by five of his six children.

Joseph Treitinger\* died on December 19, 1966, leaving an alleged will dated October 28, 1966. Following his death, this will was duly probated by his youngest child, Charles Edward Treitinger, who was named executor. Testator gave all real property owned by him at his death and all his household goods and furnishings to his daughter-in-law, Imelda Marie Treitinger, the wife of his youngest child Charles, who (with their children) lived with testator at his home. His real estate was inventoried at $20,000, although one of his sons testified that it was worth approximately $100,-000. Testator then bequeathed the rest of his estate to his six children in equal shares, and directed that his death taxes be paid out of his residuary estate. His personal estate was inventoried at $18,770. An appeal from probate was filed by five of his children, alleging that (1) at the time of the execution of the will their father lacked testamentary capacity, and (2) the will was invalid because not properly executed, and (3) the will had been procured by Imelda's undue influence. Upon contestants' petition, the Orphans' Court Judge impaneled a jury to hear the case. The jury, after hearing the evidence, found (1) that the testator was of sound mind and possessed testamentary capacity, and (2) that the signature was in fact that of the testator, but (3) that the writing (the probated will) was procured by undue influence by Imelda. The Court agreed with the first two findings, but disagreed with the third. In spite of the jury's finding of undue influence by Imelda, the Orphans' Court Judge—as is his power, since a jury's verdict is advisory only, see *Duross Will*, 395 Pa. 492, 150 A. 2d 710, infra—granted proponents' (appellees') motion for judgment non obstante veredicto and entered a Decree dismissing the appeal from

---

\* Hereinafter referred to as the testator.

probate. After contestants' exceptions were dismissed, this appeal was taken.

We shall briefly analyze and summarize the 455 pages of the record.

Joseph Treitinger, at the time he executed his will, was a nearly blind widower, 86 years of age. Charles and his wife, Imelda, came to live with his father and mother shortly after they were married in 1950. Testator's other children had left their parental home. A few years after Charles and Imelda moved into his parents' home, testator's wife was unable to perform the household duties and Imelda assumed the responsibility of caring for the family and took over all the household duties. Testator's wife died in 1956 and thereafter Imelda continued to attend to all the household duties and soon thereafter commenced to look after the testator when his blindness increased and restricted his ability to care for himself. She did all the cooking for the testator, and her husband and their children, and took care of the house. As the testator got older, he became more dependent upon Imelda and her care, and later authorized Imelda to sign checks on his bank account in order to pay the expenses of maintaining his home. On November 1, 1966, testator was admitted to the hospital on his doctor's orders, where he subsequently died on December 19, 1966.

Some time during October of 1966, Charles contacted an attorney, Norbert A. Michalski, and asked him to visit his father to discuss the preparation of his will. Michalski, who had never previously represented the testator, called upon him at his home and, in the presence of Charles and Imelda, obtained from Joseph Treitinger his wishes for his will. On October 28, 1966, Attorney Michalski, accompanied by his brother Edward, returned to the testator's home with the proposed will which he had prepared. This challenged will was

read to the testator by Michalski in the presence of his brother Edward, and Florence A. Watkins, a neighbor, and Charles and Imelda. Testator then signed his name on the last page, very slantingly to the left of the line normally used for signing a will, and also made his mark by an "X" on the signature line.* These signings were witnessed by Michalski and by his brother Edward, and by Florence A. Watkins, who signed their names as subscribing witnesses. Their testimony supporting the will will be discussed hereinafter. The jury and the Court found that the slanting signature was that of Joseph Treitinger, and the Court found that the will was signed at the end, as is required by the statute.

A Valid Signature

Section 2 of the Wills Act of 1947, P. L. 89, 20 P.S. §180.2, provides that every will "shall be signed by the testator at the end thereof." In *Knupp Will*, 428 Pa. 409, 235 A. 2d 585, the Court said (page 416): " 'The law is well settled as to what is meant by the end of a will. In Kretz Estate, 410 Pa. 590, 189 A. 2d 239, the Court said, "Since the adoption by the Legislature of the statutory requirement that a will be signed 'at the end thereof,' 'This Court has consistently resisted attempts to weaken or modify the rule. . . .' " ' As early as Wineland's Appeal, 118 Pa. 37, 41, 12 Atl. 301, 302

---

* The reason for the signature by a mark was because the testator's signature which started at the end of the will slanted sharply downward through the attestation clause, and therefore his attorney thought it would be safer if the testator signed his mark at the usual physical end of this writing, nearly opposite his signature. In view of our hereinafter express holding that the will was legally signed by Joseph Treitinger at the sequential, as well as the physical end thereof, we need not consider whether the mark constituted a valid execution of the will.

(1888), Mr. Justice PAXSON rather appropriately remarked: 'It says a will must be signed at the end thereof, and that's the end of it.' The end contemplated by the Act is not the point which is physically furthest from the beginning of the writing. As we said in Kehr Will, 373 Pa. 473, 479, 95 A. 2d 647 (1953) : ' " *The end contemplated by the statute is the logical end of the language used by decedent in expressing his testamentary purpose*," ' or, as was said in Coyne Will, 349 Pa. 331, 333, 37 A. 2d 509 (1944) : ' ". . . there must be a sequence of pages or paragraphs which relates to its logical and internal sense, *and the signature must be placed at the sequential end*." ' See, also, Baldwin Will, 357 Pa., supra." . . .' "*

Although Joseph Treitinger's signature started to the left of the line provided for his signature, and then trailed off slantingly into the attestation clause, it is clear that it does appear at the logical and sequential end of the language used by him in expressing his testamentary purpose and intentions. Accordingly, we agree with the hearing Judge that Joseph Treitinger's will was properly executed in accordance with the provisions of the Wills Act of 1947 and with the principles hereinabove set forth.

### Undue Influence and Confidential Relationship

Appellants present a number of contentions with respect to the questions and issues of confidential relationship, undue influence, and the burdens of proof required therein and thereunder. They also vigorously contend that, if nothing else, the hearing Judge acted capriciously in disregarding the jury finding of undue influence.

Section 745 of the Orphans' Court Act of 1951, P. L. 1163, as amended, 20 P.S. §2080.745, provides that in

---

* Italics in *Knupp Will*.

a will contest, the Court may impanel a jury to decide any question of fact, but the verdict of the jury shall be advisory only. In *Duross Will,* 395 Pa., supra, we pertinently said (page 509) : ". . . that the verdict of a jury is advisory only and the hearing Judge or Chancellor, if he is not satisfied with the justice of the verdict on the basis of all the evidence, may set aside the verdict and grant a new trial or enter a judgment non obstante veredicto or enter such other judgment *as satisfies his conscience upon a consideration of the entire record.*"*

The principles pertaining to and governing the issues of confidential relationship and undue influence have often been recently stated, and we believe it is unnecessary to quote therefrom. See particularly, *Carson Estate,* 431 Pa. 311, 245 A. 2d 859; *Brooks v. Conston,* 356 Pa. 69, 51 A. 2d 684; *Hamberg v. Barsky,* 355 Pa. 462, 50 A. 2d 345; *Null's Estate,* 302 Pa. 64, 153 Atl. 137; *Leedom v. Palmer,* 274 Pa. 22, 25, 117 Atl. 410. "Confidential relationship" as used throughout this Opinion is distinguishable from undue influence. One can be in a confidential relationship without exerting undue influence, just as undue influence can be exerted by one not in a confidential relationship. As pointed out in *Brooks v. Conston,* 356 Pa., supra (at pages 76-77), when a confidential relationship has been established, the burden is then shifted to that party to prove absence of fraud and that the transaction was fair and equitable.

Several of the contestants testified that the testator's mental condition began to deteriorate toward the end of his life. There was also testimony by the contestants that toward the end of testator's life, Imelda had indicated displeasure with her role of having to take care of her father-in-law, and that she became

---

* Italics in *Duross Will.*

domineering toward him. Testator's daughter testified that her brother Charles had said, "We can do anything we want with him [the testator], he is just like a baby."

The contestants rely principally on statements made by Imelda at a New Year's Eve party held at the testator's home on December 31, 1965, which was attended by many of decedent's children and relatives. Several of those who were present stated that Imelda urged one of testator's sons to get his other children to agree to sign his real property over to her and Charles. The basis of Imelda's request made at that party appeared to be that she had taken care of the testator and the house for many years and felt she and Charles were entitled to the property without obligation to pay anything for it. In addition, one of the contestants testified with respect to a conversation with proponents which took place in the funeral home after decedent's death, where Imelda allegedly said, "Yes, we had a new will made out . . . don't you worry, we come out on this will, we are top dog now, we are getting everything."

On the other hand, there was considerable testimony, including that of the contestants, that the testator throughout his lifetime was a forceful and strong-willed person, whose strong will persisted into the year of his death. Testator's attending physician testified that although at the end the testator suffered from physical disabilities, some of which could have impaired his intellect, in October of 1966, when he executed his will, Joseph Treitinger was sufficiently mentally alert to make a will. Attorney Michalski, in whom the hearing Judge placed great confidence, testified that, in his opinion, when the will was prepared and signed testator knew what he owned, knew the persons who were the objects of his bounty, knew what and to whom he wanted to leave his property, and was

mentally alert and fully capable of knowing what he wanted and what he was doing at the time he executed his will.

In *Paul Will*, 407 Pa. 30, 180 A. 2d 68, the Court, referring, inter alia, to *Royer's Estate*, 339 Pa. 423, 12 A. 2d 923, *Tetlow's Estate*, 269 Pa. 486, 112 Atl. 758, and *Hook's Estate*, 207 Pa. 203, 56 Atl. 428, observed that in order to set aside a will on the ground of undue influence where the testator is in full possession of his faculties and his testamentary capacity admitted or established, the evidence must be clear and strong, and mere opinions or suspicions or belief not founded on facts testified to will not be sufficient.

We recently had occasion to reiterate the principles of law which apply in a will contest such as this: *Protyniak Will*, 427 Pa. 524, 235 A. 2d 372. There, we said (page 532): "Testatrix's will had been prepared, we repeat, by her attorney, whose testimony showed both testamentary capacity and lack of any undue influence, and her signature was witnessed by two subscribing witnesses. When a will is drawn by an attorney who testifies as to decedent's testamentary capacity and is proved by subscribing witnesses, the burden of proving lack of testamentary capacity or undue influence can be sustained only by clear and convincing evidence: Thompson Will, 387 Pa., supra; Williams v. McCarroll, 374 Pa., supra; Higbee Will, 365 Pa. 381, 382, 75 A. 2d 599. . . .

"Where the issues are testamentary capacity, or undue influence, or an insane delusion or insanity, or confidential relationship, *the test in an appellate Court is whether the findings of fact approved by the Court en banc are based upon legally competent and sufficiently convincing evidence, and whether the Court below committed an error of law or abused its discretion:*\* Dettra Will, 415 Pa. 197, 201, 202 A. 2d 827;

---

\* Italics, ours.

Brantlinger Will, 418 Pa., supra; Hunter Will, 416 Pa., supra; Lanning Will, 414 Pa. 313, 200 A. 2d 392; Masciantonio Will, 392 Pa., supra; Williams v. McCarroll, 374 Pa., supra; Girsh Trust, 410 Pa. 455, 467, 189 A. 2d 852."

We have carefully reviewed the record, including the testimony of the contestants and of the attending physician and of the subscribing witnesses and of the attorney who drew the will. Little would be accomplished by further detailing the voluminous testimony, or in quoting the applicable principles of law which have oftentimes been reiterated by this Court. Suffice it to say that in reviewing the record and the actions and rulings of the hearing Judge, in light of all the evidence and the pertinent legal principles, we find (1) that the findings by the Chancellor, which were approved by the Court en banc, were based upon legally competent and sufficiently convincing evidence, and (2) that there was no error of law or abuse of discretion.

Decree affirmed, each party to pay own costs.

Mr. Justice EAGEN and Mr. Justice ROBERTS concur in the result.

